**UNITED STATES of America,**
**Appellee,**

v.

**Allen ROTH, Appellant.**

**No. 692, Docket 34474.**

United States Court of Appeals,
Second Circuit.

Argued April 8, 1970.

Decided July 31, 1970.

Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, John W. Nields, Jr. and Jack N. Kaplan, Asst. U. S. Attys., of counsel, for appellee.

Henry J. Boitel, New York City, for appellant.

Before WATERMAN and FRIENDLY, Circuit Judges, and ZAMPANO, District Judge.*

ZAMPANO, District Judge:

Appellant Allen Roth was convicted after a jury trial in the United States District Court for the Southern District of New York, Edmund L. Palmieri, J., on 15 counts of mail fraud in violation of 18 U.S.C. §§ 1341, 1342, and 2. His appeal challenges two rulings at trial: 1) the denial of a motion to conduct a suppression hearing outside the presence of the jury, and 2) the admission of identification testimony after three allegedly impermissible out-of-court identification procedures. We find no error and affirm the judgment of the District Court.

The Government introduced substantial evidence that Roth used the mails as part of a scheme to defraud. The essence of the scheme was that Roth, with criminal intent, utilized the name "Murray Corporation" to induce numerous manufacturers and suppliers to send him large quantities of merchandise in the belief they were doing business with the Murray Corporation of America, a highly rated concern located in New York City. Roth falsely represented that his corporation had a Dun & Bradstreet credit rating of AAA–1, and that it was a division of the Murray Corporation of America. The goods from the victim corporations were shipped pursuant to orders received either by telephone or mail from a "P. K. O'Connor" who claimed to be an officer of the Murray Corporation of New York. The Government's evidence tended to prove that Roth on these occasions employed the pseudonym "P. K. O'Connor" in order to hide his true identity.

The Government was able to produce at trial only one witness who had ever met "P. K. O'Connor." The witness, Donald Levine, testified that Roth "looked like" O'Connor, but acknowledged that he was unable to make a

* Of the District of Connecticut, sitting by designation.

positive identification. There was no objection to this testimony.

Upon receipt of a complaint from the officials of the Murray Corporation of America, postal agent Carroll conducted an investigation into the activities of Roth, "O'Connor," and the Murray Corporation. Satisfied that the mails were being used to execute the fraudulent scheme, Inspector Carroll arrested Roth as he stood next to his automobile on a public street. A search of the trunk of Roth's car uncovered various incriminating items and letters which were admitted into evidence, over objection.

■■■ Appellant first contends he was entitled to a plenary hearing at trial on his motion to suppress the seized articles. The claim is without merit. Seven months prior to the trial, Judge Bonsal denied a similar motion to suppress the evidence because the appellant failed to appear at the hearing. No reason or excuse has been offered for his nonappearance. Not until the second day of trial did the defendant again request a suppression hearing. Judge Palmieri denied the request but stated that "at the conclusion of the Government's case I will review all the evidence with a view to determining whether there is any reason for me to suppress any of" it; he also invited defense counsel to renew the suppression motion after the defense case had been presented, in which event the motion would be decided "on the basis of the trial record." Under these circumstances, Judge Palmieri would have been justified in refusing to entertain the suppression claim altogether. Rule 41(e), Fed.R.Crim.P.; United States v. Di Donato, 301 F.2d 383, 384 (2 Cir.), cert. denied, 370 U.S. 917, 82 S.Ct. 1557, 8 L.Ed.2d 497 (1962); United States v. Sansone, 231 F.2d 887, 891–892 (2 Cir.), cert. denied, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956). To the extent that he expressed willingness to suppress if the trial evidence called for it,

he was giving the defendant more than was required. In any event, we have examined the record and find there was ample evidence to establish probable cause for the arrest; a hearing would have been fruitless.

■■■ Relying on Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L. Ed.2d 685 (1969), the appellant argues that, even assuming the existence of probable cause for the arrest, Inspector Carroll was required first to obtain a warrant before he conducted a search of the vehicle. However, since the search and seizure occurred in 1966, we need not consider whether the principles established in Chimel apply. See United States v. Bennett, 415 F.2d 1113 (2 Cir. 1969). Pre-Chimel law clearly authorized the search of Roth's automobile at the time and place of the arrest. United States v. Rabinowitz, 339 U.S. 56, 70 S. Ct. 430, 94 L.Ed. 653 (1950); United States v. Chaplin, 427 F.2d 14 (2 Cir. June 1, 1970); United States v. Mazzochi, 424 F.2d 49 (2 Cir. April 7, 1970).

The appellant next asserts that Levine's in-court identification was impermissibly tainted by three prior identification procedures. Since this claim is raised for the first time on appeal, we do not have the benefit of trial court findings on the issue.[1] However, the extensive cross-examination of Levine concerning his identification of Roth provides us with a record sufficiently adequate to enable us to conclude that the admission of the identification testimony neither deprived the appellant of due process nor violated his right to counsel.

In 1966 Levine was the Eastern Sales Manager for the Brearley Company of Rockford, Illinois. He testified that in the course of his duties he met with a "Mr. O'Connor" of the Murray Corporation to discuss the sale of premium incentive gifts. Although Levine pointed out Roth in the courtroom as the person who "resembled" O'Connor, he stated he

---

1. We have recently suggested that objections to identification testimony be heard and disposed of at a pretrial hearing.

United States ex rel. Phipps v. Follette, 428 F.2d 912 n. 1 (2 Cir. May 27, 1970).

could not make a positive identification. Cross-examination disclosed that prior to being called as a witness, Levine had on two occasions walked into the courtroom "to see if Mr. O'Connor was there," and also had been shown a series of photographs from which he selected one (Roth's) as "looking most like O'Connor."

■ The first "walk through" occurred several days before Levine was called to testify, at a time when the court was in a recess. Levine entered the courtroom, observed about 12 spectators, but did not see Roth. We fail to perceive any merit to the claim that this act constituted a violation of the *Wade* requirements, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). The record clearly indicates that Roth was not in the courtroom at the time and that no identification was made.[2]

■ On the same day the prosecutor exhibited nine photographs to Levine for the purpose of determining whether he recognized "O'Connor's" picture among them. Defense counsel introduced the photographs into evidence and extensively cross-examined Levine on his selection. Thus the jury was fully informed of the nature of the photographic identification to assist it in weighing Levine's credibility. The record reveals no basis for a claim that the identification procedure was impermissibly suggestive. Cf. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); United States v. Baker, 419 F.

2d 83, 89–90 (2 Cir. 1969), cert. denied, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970). Under these circumstances, the photographic identification, in the absence of appellant's counsel, was not constitutionally proscribed. United States v. Bennett, 409 F.2d 888, 898–900 (2 Cir. 1969); accord, United States v. Ballard, 423 F.2d 127 (5 Cir. 1970); contra, United States v. Zeiler, 427 F.2d 1305 (3 Cir. June 5, 1970).

■ Shortly before he was called to testify, Levine was asked by the prosecutor to leave the witness room during a recess "to see if O'Connor was in the courtroom." Levine entered the courtroom and observed among the four people there a person (presumably the appellant) who "resembled O'Connor." Thereupon Levine returned to the witness room and informed the prosecutor that he had seen someone who "looked like O'Connor," but that he could not be sure of his identification. The prosecutor did not press him for a positive identification and, as previously indicated, Levine's testimony on the issue at trial was equivocal. Appellant contends that *Wade* entitled him to advance notice of the walk through and to the assistance of counsel during the proceeding. We agree.

Although *Wade* was directly concerned only with a formal post-indictment line-up, we find its principles equally applicable to an informal post-indictment confrontation arranged by the Government. Cf. Mason v. United States, 134 U.S.

2. The incident was developed on cross-examination of Levine as follows:

"Q. Was Mr. Roth sitting there at the time when you walked in? Was he? Was he? I am asking you. A. No, he was not.

"Q. He was not. Where was he at 2:20? A. I don't know.

"Q. Where was he? A. I have no idea.

"Q. Well, he wasn't sitting there. You say there were about eight or ten spectators in the room. Were they behind this rail, the rail in which we are enclosed? Were these spectators behind this rail? A. That's where they would have been, yes.

"Q. Who are they? A. The people you are just talking about.

"Q. Well, when you walked in, as you put it, there was no Mr. Doyle sitting here, there was no Mr. Carroll you think sitting there, no stenographer there, no Clerk here and no Judge up there, and no Mr. Roth over here. Right? A. Right, sir.

"Q. Was Mr. Roth sitting with the spectators? A. I could not find him at that time. In other words, I could not find anybody in the room at that particular time that I could identify.

"Q. Where did you find him, in the hall? Where did you find him? A. I didn't find him" (Tr. pp. 880–881).

App.D.C. 280, 414 F.2d 1176 (1969). Indeed, the more informal the viewing procedure the greater the possibility of subtle suggestiveness. Long v. United States, 137 U.S.App.D.C. 311, 314, 424 F.2d 799, 802 (1969). In a formal line-up, the police may scrupulously seek to avoid suggestive elements. However, when a walk through occurs the prevailing conditions are beyond the control of the Government, and more likely than not, the defendant will be sitting at the counsel table, the very place the witness would look to find him. In addition, the defendant knows when a lineup takes place and gains some impression of the surrounding circumstances. In most cases the identification process may be re-established easily and exactly at trial. With a walk through, there is no reason for the attorney or his client to focus on their surroundings and try to remember them; they are unaware of what is occurring. Reconstruction at trial therefore may be difficult or even impossible.

Finally, unlike the situation in *Wade,* the Government cannot claim that it would be burdensome to contact the defendant's attorney or to require its own witness to be present at his convenience rather than their own. *See* 388 U.S. at 255–256, 87 S.Ct. 1926, 1946 (White, J., dissenting). Nor can the Government assert any need for quick identification at this stage of the case. With time not a factor, there are no "substantial countervailing policy considerations * * * against the requirement of the presence of counsel." United States v. Wade, *supra,* at 237, 87 S.Ct. at 1937. Accordingly, we hold that the principles established in *Wade* apply *a fortiori* to identification confrontations such as in the instant case.

█ While we believe the walk-through identification procedure did not conform to *Wade* requirements, we are convinced that it did not taint Levine's testimony nor infect the trial. Reversal, therefore, is not required. Levine at no time made a positive identification. His testimony did not vary from his initial "look-alike" identification when he was shown the nine photographs two days before. The walk through in no way served to shore up his relatively weak identification from the witness stand.

Moreover, aside from the Levine testimony, substantial evidence supported the Government's contention that Roth was "O'Connor." Among other things, employees of two mail and telephone service companies testified that Roth over a six-year period picked up all of "P. K. O'Connor's" mail and messages. At the time of his arrest, Roth possessed 15 letters addressed to "P. K. O'Connor." In addition, shop owners identified Roth as the person from whom they purchased, at reduced prices, merchandise which had been shipped to "P. K. O'Connor" by the victim corporations.

*Finding no error, we affirm.*