James B. **PROCTOR**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 43461.

Court of Criminal Appeals of Texas.

Feb. 24, 1971.

On Rehearing April 20, 1971.

**760**

Jones, Jones & Baldwin by Carl Roth, Marshall, for appellant.

Charles A. Allen, Dist. Atty., Marshall, Jim D. Vollers, State's Atty., Austin, for the State.

### OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for assault with intent to murder without malice where following a verdict of guilty the court assessed the punishment at three years.

The record reflects that sentence was pronounced on January 14, 1970. The only notice of appeal in the record reflects such notice was filed on January 26, 1970.

Article 44.08, Vernon's Ann.C.C.P., provides that except in cases where the death penalty has been assessed or probation granted, notice of appeal shall be given or filed within ten days after sentence is pronounced. See Section (c) thereof. Section (e) of such statute provides that "For good cause shown, the trial court may permit the

giving of notice of appeal after the expiration of such ten days."

It is clear that notice of appeal was not given or filed within the time prescribed by statute, and nothing in the record reflects that the trial court for good cause shown permitted a belated notice of appeal.

Therefore this appeal must be dismissed. Nix v. State, Tex.Cr.App., 433 S.W.2d 710 and authorities there cited.

It is observed that upon a showing of good cause, the trial court in the case at bar may still permit the giving of notice of appeal, and in such event, proceedings may then be had in the trial court pursuant to Article 40.09, V.A.C.C.P. See Herbort v. State, Tex.Cr.App., 422 S.W.2d 456; Hollingsworth v. State, Tex.Cr.App., 419 S.W.2d 854; Flores v. State, Tex.Cr.App., 419 S.W.2d 202.

In the event that the trial court does permit the giving of notice of appeal under Section (e) of Article 44.08, supra, then this indigent appellant must be furnished a complete record on appeal. See Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891.

Even if timely notice of appeal had been given in the case at bar, this court would have been unable to have passed on the sole ground of error presented in light of the partial record brought forward. Under any circumstances, the appeal would have to have been abated until a complete record was furnished.

For the reasons stated, the appeal is dismissed.

### OPINION ON APPELLANT'S MOTION FOR REHEARING

ONION, Presiding Judge.

On original submission this appeal was dismissed because notice of appeal was not given within ten days after sentence was pronounced. See Article 44.08(c), V.A.C.C.P. On rehearing our attention has been

called to the fact that the Code Construction Act (Article 5429b–2, Vernon's Ann. Civ.St.) provides that in computing a period of days, the first day is excluded and the last day is included, but when such last day falls upon a Saturday, Sunday or legal holiday, the period is extended to include the next day which is not a Saturday, Sunday or legal holiday. In Barbee v. State, Tex.Cr.App., 432 S.W.2d 78, the Code Construction Act was cited with approval overruling earlier criminal cases to the contrary.

■ Therefore, we conclude that the last day in which notice of appeal should have been given in the case at bar fell on Saturday, January 24, 1970, but in light of the Barbee decision and the Code Construction Act, the notice of appeal given on Monday, January 26, 1970, was timely.

Further, a supplemental transcript has been filed and the case shall be considered on its merits.

In his sole ground of error appellant contends the trial court erred in permitting his in-court identification by the witness Coleman since there was no clear and convincing proof that such identification was not tainted by pre-trial identification procedures and confrontations.

The appellant filed a motion to suppress such testimony claiming the same was not based upon independent recollection of the witness but in part upon hearsay, suspicion and speculation and that the pre-trial identification was unnecessarily suggestive and conducive to mistaken identification resulting in a denial of due process.

■ The record at the hearing on the motion to suppress reflects that on September 30, 1968, Constable Coleman responded to a burglar alarm at approximately 3 a. m. and proceeded to the Lindsey General Store in Jonesville. There he observed two men inside the store but was unable to identify them. Calling out the names of the store owners and receiving no response, Coleman proceeded to the rear of the building. One of the burglars who left by the rear door rounded the corner and came face to face with Coleman who fired a blast from his shotgun as the burglar jumped back in haste. Coleman then fired a second shot into the rear door. While attempting to reload, Coleman was struck by a volley of shots.[1]

While in the hospital Coleman approved a composite picture drawn by another officer from his description of the man at whom he fired his shotgun. The police bulletin issued with the drawing described the subject as an "unknown" white male, 19 to 25 years old, 5' 6" to 5' 8" tall weighing 150 pounds with dark hair combed back.

Although Coleman had known the appellant since the early 1950's and would have immediately recognized him at the grocery store or post office, he never told the officers that the appellant was the man he had seen or even mentioned his name. He described his view of the burglar rounding the corner of the building during early morning hours as a "brief but good look."[2]

He was then asked:

"Q. And you also said that the look you got at him wasn't good enough to

---

1. Law enforcement officers later recovered at the scene the weapon suspected as having been used to shoot Coleman and tools apparently used in the burglary, but there was no ballistics test, fingerprint checks, or other scientific studies or methods used in an attempt to identify the guilty party or parties.

2. The only evidence as to lighting conditions is found in Coleman's testimony before the jury:

"Q. Will you tell the court and jury how the outside and the rear of T. C. Lindsey's store is lighted?
"A. Pretty well lighted for a country store there. Lights turn on when they close for the night. Also, there is an automatic light, vapor type lights come on from dusk to dawn, they turn on automatically."

762

cause you to remember him or know who it was? You said not that quick?

"A. It didn't register on my mind that that was J. B. Proctor. Just no more than I got to see him."

Coleman related that it was "at a later date" that he concluded the person he had confronted at the corner of the building was J. B. Proctor and that he would not have said on the "day of September 30th to go get J. B. Proctor."

Approximately three weeks after the incident Coleman learned from a Texas Ranger of a teletype from Little Rock, Arkansas requesting information about a shooting incident similar to the one in which Coleman had been injured.

The exact order of events thereafter is not clear from the testimony of the witnesses. It appears the Harrison County Sheriff's office received information from a police captain in Little Rock that an unidentified informer had reported J. B. Proctor, white male "about 37," 5' 10" tall and weighing 135 pounds[3] was involved in a shooting with an officer at the scene of a burglary in southern Arkansas. When the officer said there had been no such incident in Arkansas the informer reported the incident could have occurred in Louisiana or Texas.

Coleman then went to the Sheriff's office and asked them to obtain a picture of Proctor along with pictures of his known associates.[4]

Because he believed the Sheriff's office was not as enthusiastic as it could have been about the case, Coleman obtained a mug shot of the appellant from Arkansas through the efforts of a federal treasury agent. He kept this picture of the man the informant had indicated was responsible for shooting him in his possession until the

date of the trial. Later he saw pictures of the appellant and one Bobby Milam and his brother which the Sheriff's office had received from Arkansas, as well as the Sheriff's entire file on the case.

Thereafter Coleman made a trip to Little Rock at his own expense in an attempt to get more information concerning his assailant and talked to the police captain involved who refused to identify the informer but who "nodded some affirmative type agreement" as Coleman described his assailant.

Somewhere in this process a warrant of arrest was issued for the appellant and a co-defendant Bobby Milam. The "wanted" notice then issued to be published in the next Department of Public Safety bulletin changed the description of Proctor from that given by Coleman to a description corresponding to that given by an unknown Arkansas informer and reflected Proctor's age at 41 years rather than the 19 to 25 years age group indicated by Coleman. When Milam was apprehended in Arkansas the Sheriff's office returned him to Harrison County without notifying Coleman, whom the Chief Deputy felt was "too emotionally involved." Upon learning of Milam's presence in jail Coleman began interrogating him. Milam at first denied any knowledge of the crime. Sometime thereafter "late one night" he made a confession while Coleman was present implicating the appellant in the alleged offense.

Coleman also obtained a letter written by one "Mary" to Milam's younger brother relating how "Bob" and "J. B." had to shoot their way out of a place down in Texas the previous Saturday night.

The appellant Proctor was apprehended in the State of Indiana and returned to Harrison County in December 1969, some 14 or 15 months after the alleged offense and approximately a year after he had been

---

3. At one point in the testimony Chief Deputy Sheriff Anderson testified the appellant was in excess of 6 feet tall.

4. Chief Deputy Sheriff Anderson testified that appellant's name was never mentioned until after "a lead" was received from Arkansas.

indicted. No lineup was held, but Coleman went to the jail on several occasions "just to see what he was doing" and viewed him in a one-to-one confrontation in the maximum security cell in the absence of counsel who had been appointed.

On the day appellant was arraigned, Coleman rode down in the elevator with him and was present in the courtroom when he was served with a copy of the indictment.

The record reflects the following from Coleman's testimony:

"Q. I think you described it to me that you came to the conclusion, or became convinced, as to the identity of Proctor as being the man out there that night when a chain of pieces or circumstances that fell into place, that you were able finally to conclude in your mind that this was Proctor? [5]

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Of course, all of this that you've described, you jostled your memory to where you were able to positively say that was Proctor?

"A. I say I exercised my channels of thought, and stronger and stronger with the days that went by I was more sure of it. I had satisfied myself that it was.

"Q. Of course, without all of this investigation, you might never have satisfied your mind that way.

"A. No, I don't think I would have."

Following the hearing on the motion to suppress the trial court found the identification was "not tainted by illegal lineup" and the in-court identification originated from an independent source. While the

findings were not as clear cut as those recommended in Martinez v. State, Tex. Cr.App., 437 S.W.2d 842, 849, it does appear the trial court considered the pre-trial confrontations, photographic identification to be impermissible and excludable per se. Nevertheless the trial court found the in-court identification to be admissible, believing it to be of an independent origin.

Thereafter, over objection, the witness Coleman in the jury's presence positively identified the appellant as the person he encountered at the corner of the Lindsey store on the night of the alleged offense.

"Q. What did the individual you saw have in his hand?

"A. A man came around the corner of this building with a snub nose nickel plated pistol in his right hand.

"Q. Do you see that man in the courtroom?

"A. That is the man right there I encountered at the corner of the building.

"MR. ALLEN: Let the record show Mr. Coleman is pointing directly to J. B. Proctor.

\* \* \* \* \* \*

"Q. Is there any question in your mind Mr. Coleman, but that the person you met there at the southwest corner of T. C. Lindsey's store that night is the defendant, J. B. Proctor?

"A. There he sits right there, that's him."

This was the only testimony before the jury placing the appellant at the scene of the alleged offense.

In determining whether the in-court identification is of an independent origin

5. At one point in his testimony Coleman described the "last link" in the "chain of pieces" to be the letter from "Mary" to Frankie Milam.

At another place Coleman testified, "I had seen some pictures, my thoughts and everything put together, and having seen the pictures from Arkansas, a bunch of pictures as far as that goes, somebody had them downstairs."

or source the Supreme Court in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, adopted the test applied in Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L. Ed.2d 441, 445: "'[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." [6]

Considering the guiding criteria for the application of this test as announced in Wade and discussed in Martinez v. State, Tex.Cr.App., 437 S.W.2d 842, 846, we note that the witness Coleman had little opportunity to observe the man he saw at the corner of the building just prior to the alleged offense and even though he knew the appellant he did not recognize him at that time. Further, there was a discrepancy between the description given by the witness shortly after the alleged offense and the actual appearance of the appellant. The earlier description was of a man some six inches shorter, fifteen pounds heavier and 12 or more years younger than the appellant.

After being told that an unknown informer had identified the appellant as the man who had perpetrated the offense the witness obtained mug shots of the appellant and maintained possession of them at all times prior to any out of court or in-court identification.

Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, did not prohibit photographic identification techniques widely used in current police procedures and this court has said that the mere showing of pictures to a witness prior to a lineup or in-court identification is not a denial of due process. Daniels v. State, Tex.Cr.App., 464 S.W.2d 368; Evans v. State, Tex.Cr.App., 444 S.W.2d 641. See also Smith v. State, Tex.Cr.App., 459 S.W.2d 642; Thames v. State, Tex.Cr.App., 453 S.W.2d 495; Grundstrom v. State, Tex.Cr.App., 456 S. W.2d 92; Bowman v. State, Tex.Cr.App., 446 S.W.2d 320. The mere fact, however, that pictures of the accused are shown to a witness prior to a lineup or in-court identification is one of the factors to be considered in determining whether an in-court identification is of independent origin. See United States v. Wade, supra; Martinez v. State, supra.

What Simmons did hold was that

"* * * convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside * * * if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [7]

---

6. It is clear that the principles of Wade are not strictly limited to a formal post indictment lineup. See United States v. Roth, 2 Cir., 430 F.2d 1137.

7. In Simmons the Court said:
"It must be recognized that improper employment of photographs by police may sometimes cause witnesses to err in identifying criminals. A witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions. Even if the police subsequently follow the most correct photographic identification procedures and show him the pictures of a number of individuals without indicating whom they suspect, there is some danger that the witness may make an incorrect identification. This danger will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime. Regardless of how the initial misidentification comes about, the witness thereafter is apt to retain in his memory the image of the photograph rather than of the

In United States v. Sutherland, 428 F.2d 1152, the Fifth Circuit Court of Appeals said:

"As we read Simmons, an 'impermissibly suggestive' picture spread requires the exclusion of any in-court identification as to which there was a 'substantial likelihood of irreparable misidentification.' Since the District Judge had clearly ruled that both elements of Simmons were present in the instant case, we hold that he was in error in not excluding the in-court identifications. This case must therefore be reversed and remanded for a new trial."

In the case at bar there never was any picture spread involving photographs of the appellant. The witness requested by name and obtained mug shots of the appellant identified by an informer as the guilty party and kept possession of the same until the time of trial.

It would appear that as in Sutherland both elements of Simmons are present and for this reason alone the admissibility of the in-court identification rests upon questionable ground.

Further, the witness viewed the appellant, who was under indictment in jail on several occasions some 14 or 15 months after the alleged offense, in the absence of counsel. It is not clear from the record the time that actually elapsed between the alleged act and the time Coleman made up his mind definitely that the appellant was the man he had seen. The lapse of time, however, between the alleged act and the in-court identification was some fifteen and one-half months.

It is true that the witness never identified anyone else as the perpetrator of the crime nor did he fail on some prior occasion to identify the appellant, and these are factors to be considered too. Nevertheless, when all the factors are considered together and

taken in connection with the co-defendant's confession implicating the appellant and "Mary's" letter and the witness Coleman's testimony that "without all of this investigation" he would not have been able to identify the appellant as the man he saw at the scene of the alleged crime, we are unable to conclude that there was clear and convincing proof that the in-court identification was of independent origin. The court erred in admitting such testimony into evidence.

We need not, however, rest our decision upon a violation of the Wade principles. As we view the "totality of the circumstances," the identification procedure was so unnecessarily suggestive and conducive to irreparable mistaken identification as to amount to a denial of due process. See Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199; Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402; Palmer v. Peyton (4th Cir.) 359 F.2d 199; Crume v. Beto, 5 Cir., 383 F.2d 36; Pearson v. United States (5 Cir.) 389 F.2d 684; Graham v. State, Tex.Cr.App., 422 S.W.2d 922; Cobbins v. State, Tex.Cr.App., 423 S.W.2d 589 (concurring opinion); Martinez v. State, Tex.Cr.App., 437 S.W.2d 842 (footnote #2); Evans v. State, Tex.Cr. App., 444 S.W.2d 641, 645; David v. State, Tex.Cr.App., 453 S.W.2d 172, 178.

Since the witness, the victim of the crime, was a peace officer and conducted most of the investigation himself, the question has been a most difficult one. We have concluded that the facts are a far cry from those in People v. Watkins, 46 Ill.2d 273, 263 N.E.2d 115, where the witness-victim was also a peace officer, nor is this case controlled by our recent decision in Spencer v. State, Tex.Cr.App., 466 S.W.2d 749, where the officer-witness testified his positive identification of the defendant was based on his observations at the time of the alleged act even though he had an occasion to see the defendant in jail for a purpose

person actually seen, reducing the trustworthiness of subsequent lineup or court-

room identification." (390 U.S. at 383, 88 S.Ct. at 971, 19 L.Ed.2d at 1253).

other than identification. The cases are clearly distinguishable on the facts.

For the reasons stated, the appellant's motion for rehearing is granted, the judgment is reversed and the cause remanded.

MORRISON, Judge (dissenting).

The identification of appellant in the case at bar, as I see it, was far less difficult than in Spencer v. State, Tex.Cr.App., 749 S.W.2d 466. My thirty-seven years in dealing with peace officers professionally causes me to have no doubt that Constable Coleman recognized, though belatedly, this appellant, whom he had known for twenty years.

I respectfully dissent to the reversal of this conviction.