**Ernesto GARCIA, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 67877.

Court of Criminal Appeals of Texas En Banc.

Dec. 9, 1981.

Rehearing Denied Jan. 20, 1982.

**48**

Jerrold R. Davidson, Brownsville, for appellant.

Reynaldo S. Cantu, Jr., Dist. Atty., and Kirk Brush, Asst. Dist. Atty., Brownsville, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for capital murder in which the death penalty was assessed following the jury's affirmative answers to the first two special issues under Article 37.071, V.A.C.C.P.[1] Appellant was indicted for murder while in the course of committing robbery. V.T.C.A., Penal Code, § 19.03(a)(2).

Appellant was jointly indicted and jointly tried with Antonio Barrientes. The co-defendant, however, was acquitted by the jury.

1. The third special issue under Article 37.071, supra, was not submitted to the jury.

2. The second special issue is found in said Article 37.071(b)(2), which reads:

At the outset we are confronted with appellant's contention that the evidence is not sufficient to support the jury's finding as to the issue of future dangerousness— the second special issue under Article 37.-071, supra.[2]

Serano Villanueva and his cousins, Juan Manuel Villanueva and Pasqual Lopez, the deceased, all Mexican nationals, illegally crossed the Rio Grande River from Mexico into Texas about 8:30 p.m. on January 10, 1980. Their purpose was to seek work in Texas near Ricardo. Serano Villanueva had about $80.00 in United States currency and the deceased had about $200.00 in his wallet. After crossing the river and walking towards Brownsville, they found a hiding place where they stayed for about an hour. Leaving Juan Manuel in the hiding place, Serano and Pasqual went in search of a taxi to take them to the city limits of Brownsville.

During their search about 10 p.m. they came upon the appellant, Ernesto Garcia, Antonio Barrientes, Gilberto Rangel and Sotero Castillo in the back yard of the home of appellant's father. These men were drinking beer and playing guitars. These men had been drinking for some time that day. Villanueva and Lopez asked for a ride to a taxi stand. Barrientes established by inquiry that the two men were from Mexico. Castillo stated he had no gas in his car so Villanueva offered to pay $5.00 for gas and finally agreed to pay $10.00 so that beer in addition to gas could be purchased. Castillo gave his car keys to Barrientes and Villanueva and the deceased Lopez got in the back of the car. Appellant, however, directed Villanueva to get in the front seat with Barrientes, the driver, and he got in the back seat with the deceased.

The foursome drove to a gas station. The deceased gave $10.00 to Villanueva who in turn gave the money to Barrientes for the purchase of gasoline. After they left

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

the service station, appellant told Barrientes to turn off the main thoroughfare and into a side street.

Serano Villanueva recalled that shortly after the turn the appellant placed a gun to his head and demanded his and Lopez's money as the car commenced to stop. Villanueva saw the appellant hit Lopez with the gun, which he thought was a small .22 cal. gun, and when Lopez agreed to give up the money appellant shot Lopez. At this point Villanueva asked Barrientes what was happening. Barrientes told him he didn't know but that Villanueva should "run."

Villanueva left the car and began to run. Back on the main thoroughfare he headed towards the service station, but soon observed the same car coming towards him. He saw the appellant aim the gun at him, but the appellant did not shoot. He ran in a different direction, but after the car passed he continued on to the service station and asked that the police be called.

The next day the police found the body of the deceased in the grass near a river levee about a five minute drive from the service station in question. It appeared the body had been carried to the spot where it was found rather than being dragged. Lopez's wallet and watch were missing and only a few Mexican coins were found in his clothing. There was a bullet wound above the right ear. The cause of death by virtue of an autopsy was shown to be a bullet wound to the head.

The co-defendant, Barrientes, age 25 years, testified in his own defense. He related that on January 10, 1980, he was playing basketball and drinking beer in Lincoln Park until about 5 p.m. when he went to appellant's home and continued to drink in the yard until later that evening when two strangers appeared and asked to be taken to a taxi stand. He corroborated much of what Villanueva related as to what followed. Barrientes drove the strangers and the appellant Garcia first to the gas station where the deceased gave him $10.00 for the gas. After they drove away from the gas station he heard the appellant demand money and heard a struggle in the back seat "like they were punching at each other." He turned off International Boulevard onto a side street at Garcia's direction and about this time heard a shot. He began to stop the car. He related upon inquiry by Villanueva he told Villanueva that he didn't know what was going on and told Villanueva to run and he did. Barrientes then drove several blocks and got back on International Boulevard where he again saw Villanueva. A short distance away Garcia told him to stop and tried to get into the front seat. Being afraid of Garcia, knowing he had a gun, Barrientes stopped the car and ran. He went to his grandmother's house, but he decided to go back to the Garcia home to tell Sotero Castillo what had happened to Castillo's car. While walking there, and about 20 minutes after he got out of the car, appellant Garcia drove up behind him. Appellant told him not to say anything about the blood in the car and appellant poured some salt on the stain on the car seat. He then drove with appellant to Garcia's home where appellant said someone had "thrown up" and he was going to clean up the seat.

Barrientes testified he had never been convicted of a felony and had not planned with the appellant to rob the deceased.

The 31-year-old appellant testified that he lived with his parents and slept until 1 p.m. on January 10, 1980. He was unemployed. In the early afternoon he began drinking beer in the yard with a friend, and various other individuals later came by and drank with them. He stated that no strangers came by the yard and that he didn't go driving anywhere in a car. He stated he went inside the house about 11:30 p.m. and told the others to go home. William Fragoso testified he was in the Garcia yard from 8 p.m. to midnight on the date in question and didn't observe any strangers and did not see Castillo's car there. Appellant's father testified the appellant had lived at home all his life except for the three years he was in the "Marines." He stated appellant was in the yard all evening.

The court charged on the defense of alibi which the jury rejected.

At the penalty stage of the trial only one witness testified and his testimony was the only evidence offered at that phase of the proceedings. He was Jerry Landrum, a doctor of psychology, from Tyler. He testified he had been in private practice for 10 years, and taught at the University of Texas, Tyler Branch, in the Department of Criminal Justice. He agreed that it was possible to make a determination whether it is probable that a particular individual will commit violent acts in the future and be a threat to society. In response to how that determination could be made, he answered:

"Normally what you would want to look at is get some information from the individual himself, if he will become involved with you. You want to look at his history of conflicts with other people, perhaps arrest records if you have that available, and certainly make some evaluation. As to whether this person basically lives by his conscience to not commit violent acts against other people or whether this is a person, by his history, who is shown to be aggressive and noncaring about the rights of other people."

Dr. Landrum related he was requested by the State to make an evaluation on the appellant. He did see the appellant,[3] but related the appellant refused to talk to him when he tried to get some history and information and was uncooperative in that manner. He didn't think appellant refused on the basis of his lawyer not being present but had simply stated "I don't want to talk to you."[4]

The witness then related he stayed in the same room with the appellant for about 30 minutes observing him. He did not describe any actions by the appellant nor what he observed. In response to interrogation by the State, he stated he had an opinion on the probability of the appellant committing violent acts in the future. An objection to his testimony was urged on the basis that the witness was not shown to be qualified and that no proper predicate had been laid. It was overruled.

The record then reflects:

"Q  What is that opinion?

"A  It is my opinion that there is a probability that he will be aggressive and violent in the future if given the occasion and opportunity.

"Q  Dr. Landrum, have you developed what I will call a psychological profile of Ernesto Garcia?

"A  Yes.

"Q  Can you tell us, basically, what I am using or what you would use the term psychological profile to mean?

"A  Well, again, you are looking at the individual's behavior, an indication of his past behavior. Psychologist and psychiatrists are asked to categorize or label or make a diagnostic impression, so that, to me, would be the same thing.

"Q  What is your diagnostic impression of Ernesto Garcia, Doctor?

"A  Basically, that of an aggressive antisocial personality.

"Q  And what elements have you considered in reaching the aggressive and antisocial label, should I say?

"A  First thing you would want to look at are indications of past behavior, any indications of arrests for inappropriate past behavior, whether the person expressing any remorse or any guilt for any of his past behavior or whether he tends to completely rationalize his behavior. 'I didn't do anything wrong. All my problems are because of other people.' Not accepting blame and responsibility would be one of the prime factors in making that evaluation, callousness. The use of various sub-

---

**3.**  Neither the date nor the location of the interview was given.

**4.**  Dr. Landrum explained that "I told him that I was a psychologist, that I had been sent to see him to talk to him at the request of the State and certainly he did not have to talk to me if he so chose. I was basically interested in his personality and his background and would try to keep from asking him anything specifically about the offense that he was charged with."

stances or drugs is common also impulsiveness, likely to react with minimal provocation and, basically, egocentric.

"Q Did you consider all of these elements in your evaluation of Mr. Garcia?

"A Yes, sir."

There was no showing that any tests were administered to the appellant. As noted Dr. Landrum did not relate any actions by the appellant nor any observations he made while in the room with the appellant for 30 minutes after the appellant refused to talk. There was no showing that the 31-year-old appellant had any prior arrests or any type of criminal record, or that there were prior acts of violence on his part, or that he failed to show remorse for any inappropriate past behavior on his part, or that he tried to rationalize his past behavior, if any, or was generally aggressive, impulsive, egocentric, or had a history of conflicts with other people and was non-caring of other people's rights. Having been unable to obtain any history or information from the appellant, there is no showing that Dr. Landrum obtained any history or information or records of any kind from any other source. It was Dr. Landrum's testimony that from his silent 30 minute observation he was able to satisfy himself of all the necessary elements to make the determination that it was probable that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. There is nothing to indicate Dr. Landrum knew the facts of the instant case, or if he did, took them into consideration in reaching his evaluation.

Dr. Landrum's testimony is ludicrous in light of the record before us and cannot be seriously considered in assaying the evidence to support the finding to special issue no. 2 under Article 37.071, supra.

It is clear, however, that in answering the special issues under Article 37.071, V.A.C.C.P., the jury may consider all of the evidence adduced at the guilt stage of the trial. *Duffy v. State,* 567 S.W.2d 197 (Tex. Cr.App.1978); *Felder v. State,* 564 S.W.2d 776 (Tex.Cr.App.1978); *Brock v. State,* 556 S.W.2d 309 (Tex.Cr.App.1977); *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976). See and cf. *Wallace v. State,* 618 S.W.2d 67 (Tex.Cr.App.1981) (Concurring Opinion at p. 70). Indeed the circumstances of the offense and the facts surrounding it may furnish greater probative evidence than any other evidence regarding the second special issue submitted at the penalty stage of a capital murder case. *Duffy v. State,* supra, and cases there cited.

Despite the brutal facts of the instant case, did the State sustain its burden of proof *beyond a reasonable doubt* that there was a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society? See Article 37.071(b)(2), V.A.C.C.P. There was no showing of a prior criminal record or prior acts of violence on the part of the 31-year-old ex-marine. This was not a case where the robbery feature of the offense was long in the planning stage or a case where an armed individual drives around searching for an ideal situation for a robbery, intending to use violence if necessary. The record shows the appellant had been drinking most of the afternoon and well into the evening before two "wetbacks" appeared at the yard of his home. They were seeking a taxi and offered to pay for the gas to take them to a taxi stand. Obviously they had some money, and the appellant may well have meant to take advantage of them because of their illegal status. The facts have already been stated and need not be repeated here. We do observe, however, there was conflicting evidence about the shooting. Villanueva testified the appellant demanded money, hit the deceased with a gun, and when the deceased agreed to surrender his money, the appellant shot the deceased. The acquitted co-defendant, Barrientes, heard the demand for money, but also heard a struggle or a "punching" before the shot was fired.

This was a senseless and unnecessary murder, and the jury may well have been incensed by what they considered perjury

when the appellant claimed not to have left his yard that night. Nevertheless, we cannot conclude the evidence, taken as a whole, is sufficient to support the jury's finding on the issue of future dangerousness. See and cf. *Wallace v. State*, 618 S.W.2d 67 (Tex.Cr. App.1981); *Horne v. State*, 607 S.W.2d 556 (Tex.Cr.App.1980); *Brooks v. State*, 599 S.W.2d 312 (Tex.Cr.App.1979); *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978).

The punishment is reformed to life imprisonment. See *Wallace v. State*, supra, and cases there cited.

Appellant also contends the court erred in overruling his motion to suppress his in-court identification by Serano Villanueva after a hearing thereon.

Appellant urges that the pre-trial identification procedures violated his right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, § 10 of the Texas Constitution and were so suggestive so as to violate the due process clause of the said Fourteenth Amendment and the due course of the law of the land provided by Article I, § 19 of the Texas Constitution.

On the night of the shooting (January 10, 1980), Villanueva called the police and gave a description of the two men who had given him and his cousin a ride. He told the officers he could identify them if he saw them and heard them talk. Officer Alfredo Gutierrez recalled that Villanueva had given a detailed description of the men, but the officer had misplaced the notes he made that night.

On January 12, 1980, officer Eduardo Flores showed Villanueva several "mug books" to see if he could make an identification. No suggestions were made. Villanueva viewed two books without making an identification. About this time the appellant was brought into an adjoining room by officer Ochoa. Villanueva could see the appellant through a one-way mirror wall and could hear him speak. Appellant was

not under arrest at the time Villanueva was asked if he could identify the man in the other room. No suggestions were made. Villanueva told officer Flores that Garcia looked familiar to him and he looked "a lot like" the man in the back seat, but he couldn't be sure. Appellant was released. Villanueva explained that later "... I began remembering more and more and I was more sure that he was the one."

It appears Villanueva continued to look at "mug books" and identified a photograph of Barrientes as the driver of the car and selected a picture of one Jesus Flores as having the same features as the other man, "looked like him," but Villanueva was not sure.

A statement was taken from Barrientes implicating the appellant. Villanueva also picked out appellant's picture from the third "mug book" he viewed without any suggestions being made. Villanueva stated he did not recall anyone telling him Barrientes had made a statement or the contents thereof.[5] On the same day appellant was arrested by virtue of a warrant and was taken before a Justice of the Peace who warned him of his rights under Article 15.17, V.A.C.C.P., and *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These warnings included the right to counsel. The magistrate was under the impression at the time that the appellant or his family were going to retain counsel.

On January 14, 1980, Barrientes and the appellant were placed in a six-man police lineup. The officer conducting the same related that he explained the procedure and both men voluntarily agreed to participate in the lineup. Villanueva identified Barrientes and the appellant from the lineup as the two men who were in the car when his cousin was shot and killed. There was no showing of any suggestiveness on the part of the police and Villanueva testified that no one told him whom to select or indicated which ones were suspects.

---

5. The sequence between Barrientes' statement and Villanueva's selection of appellant's picture is not clear from the record.

Villanueva testified he had seen the men in the back yard when he and his cousin approached them, and that he spent 15 to 20 minutes in the car with them before the shooting. He stated he "remembered" the two men from the night of the shooting.

■ Turning to the right to counsel question first, we observe that with regard to the photographic display the appellant was not entitled to have counsel present. *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *White v. State*, 496 S.W.2d 642 (Tex.Cr.App.1973).

■ With regard to viewing the appellant through a one-way mirror, this court has refused to extend the holdings of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), so as to require counsel at, on or near the scene during confrontation between a suspect and a witness occurring shortly after the commission of a crime, or in other circumstances which necessitate a prompt identification there being a reasonable elasticity as to time and place. *Writt v. State*, 541 S.W.2d 424 (Tex. Cr.App.1976), and cases there cited; *Archie v. State*, 615 S.W.2d 762, 764 (Tex.Cr.App. 1981).

Further, *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), held that a showing after arrest but before the initiation of any adversary criminal proceedings, unlike the post-indictments involved in *Gilbert* and *Wade*, is not a criminal prosecution at which the accused, as a matter of absolute right, is entitled to counsel. See also *Wyatt v. State*, 566 S.W.2d 597, 600 (Tex. Cr.App.1978), and cases there cited; *Moore v. Illinois*, 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977).

■ At the time of the viewing in question, the appellant was not under arrest and the record indicates the appellant had come with the officers to the jailhouse voluntarily during their investigation. Thus the showup in question was investigatory and not accusatory in nature. No formal charges had been filed against the appel-

lant, and he was not entitled to counsel as an absolute right. *Wyatt v. State*, supra.

■ With regard to the right to counsel at the lineup, the facts were not as well developed as they might have been. There was no clear-cut showing that formal charges had been filed initiating adversary criminal proceedings. The only indication was that appellant had been arrested on a warrant, taken before a magistrate as required by Article 15.17, supra, and was in jail at the time of the lineup. This does not of itself establish the filing of formal charges. If, however, formal charges had been filed there was little evidence on the issue of waiver of counsel. There was no express waiver, either oral or written. The State notes that appellant was warned by the magistrate of his rights including the right to counsel and that he voluntarily participated in the lineup. Appellant notes that on the day of the lineup he requested the magistrate to · appoint him counsel. Whether this was before or after the lineup is not clear. Be that as it may, if no formal charges had been filed appellant was not entitled to counsel as a matter of right. *Wyatt v. State*, supra. And even if it could be argued that formal charges had been filed prior to the lineup and that no waiver of counsel was shown, no reversible error would be presented. The State showed by clear and convincing proof that Villanueva's in-court identification of the appellant was of independent origin based on his observations of the appellant during the time he saw him in appellant's back yard and in the car prior to the shooting and was not tainted by the lineup. *Wyatt v. State, supra; Ragon v. State*, 506 S.W.2d 214 (Tex.Cr. App.1974); *Nichols v. State*, 511 S.W.2d 269 (Tex.Cr.App.1974); *Beaupre v. State*, 526 S.W.2d 811 (Tex.Cr.App.1975). Appellant's claim of the denial of counsel at the pre-trial identification procedures is without merit.

We now consider appellant's claim of the violation of due process in the pre-trial identification procedures.

*Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), made clear

that even if counsel is not required at a confrontation that it remains open to an accused to allege and prove that the confrontation resulted in such unfairness that it infringed on his right to due process of law. There the Court wrote:

> "We turn now to the question whether petitioner, although not entitled to the application of Wade and Gilbert to his case, is entitled on his claim that in any event the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law. This is a recognized ground of attack upon a conviction independent of any right to counsel claim. *Palmer v. Peyton*, 359 F.2d 199 (C.A. 4th Cir. 1966)."

See also *Graham v. State*, 422 S.W.2d 922 (Tex.Cr.App.1968).

The test to be applied in such cases is as the Supreme Court said in *Stovall v. Denno*, supra: "... a claimed violation of due process of law depends on the totality of the circumstances surrounding it ...." See also *Graham v. State*, supra.

■ Although identification procedures whereby suspects are viewed singly by a witness rather than by conducting a lineup has been widely condemned, *Stovall v. Denno*, supra, due process is not invariably violated by such procedure. *Biggers v. Tennessee*, 390 U.S. 404, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968). Each case must be considered on its own facts to determine the likelihood that a particular pre-trial confrontation resulted in irreparable misidentification. *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). See also *Archie v. State*, 615 S.W.2d 762, 764 (Tex.Cr.App.1981).

In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Court held the due process clause of the Fourteenth Amendment did not compel the exclusion, in a state criminal trial, apart from any consideration of reliability, of pre-trial identification evidence obtained by a police procedure that was both suggestive and unnecessary. The Court noted that, unlike a warrantless search, a suggestive pre-indict-

ment identification procedure does not in itself intrude upon a constitutionally protected interest.

The Court held that reliability is the linchpin in determining the admissibility of identification testimony for confrontation occurring both prior to and after *Stovall v. Denno*, supra, where it was held that determinations depend upon the totality of the circumstances. The Court noted that the factors to be weighed against the corrupting effect of a suggestive identification procedure in assessing reliability are those set out in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ Further photographic identification does not automatically taint an in-court identification. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Ward v. State*, 474 S.W.2d 471 (Tex. Cr.App.1971); *Jones v. State*, 458 S.W.2d 62 (Tex.Cr.App.1970); *White v. State*, 496 S.W.2d 642 (Tex.Cr.App.1973). Convictions based on eyewitness testimony at a trial following a pre-trial identification will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Simmons v. United States*, supra; *Proctor v. State*, 465 S.W.2d 759 (Tex.Cr.App.1971); *White v. State*, supra.

■ In the instant case there was no suggestiveness shown with regard to photographic display, the one-on-one confrontation or the lineup. In the absence of a police procedure that was suggestive and unnecessary, we need not consider the factors set forth in *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). See *Manson v. Brathwaite*, supra. The in-court identification in question was of independent origin and based on the observations of Villanueva just prior to the shooting. Considering the totality of the circumstances, we reject appellant's claim of violation of due process.

In another ground of error appellant contends the court erred in overruling his pre-

trial "Motion to prevent a challenge for cause venireman with conscientious scruples against the infliction of the death penalty." In said motion, urged prior to the selection of the jury, he requested that the State be prevented from challenging prospective jurors on the sole basis that the individual had conscientious scruples against the infliction of the death penalty [apparently relying upon *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)], and that the disqualification of prospective jurors under V.T.C.A., Penal Code, § 12.31(b), violated his constitutional rights [See now *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980)]. If the appellant obtained a ruling on his motion, he does not direct our attention to that portion of this voluminous record where such ruling was made. If no ruling was obtained, no error was preserved for review. If an adverse ruling was obtained as asserted in appellant's brief, we observe the motion in limine was only a request that the court order the State to follow the law during the voir dire examination. We do not conclude the court erred in overruling such pre-voir dire motion.

In his argument under the stated ground of error appellant also contends the court erred in sustaining the State's challenge for cause five prospective jurors who expressed only general scruples against the death penalty and were not disqualified under the rule of *Witherspoon.*

■ Our examination of the voir dire record does not support appellant's contention. Furthermore, since the punishment has been reformed to life imprisonment, *Witherspoon* would not govern in the instant case. *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *Bradley v. State*, 450 S.W.2d 847 (Tex.Cr.App.1969); *Parks v. State*, 437 S.W.2d 554 (Tex.Cr.App.1969); *Hinkle v. State*, 442 S.W.2d 728 (Tex.Cr.App.1969); *Simmons v. State*, 504 S.W.2d 465 (Tex.Cr. App.1974); *White v. State*, 591 S.W.2d 851, 858 (Tex.Cr.App.1979).

Appellant also contends the court erred in overruling his challenge for cause as to prospective juror Michael Tilden and in denying him additional peremptory challenges.

After the voir dire examination of Tilden, he was challenged for cause by the appellant without assigning any reason. See Article 35.16, V.A.C.C.P. [Reasons for challenge for cause]. Thereafter, co-defendant Barrientes exercised a peremptory challenge as to Tilden and he was excused. At this time appellant had not exhausted his peremptory challenges. Some time later in the voir dire process appellant asked for "additional strikes" without stating any basis for that request. The request was denied. Subsequently after exhausting his peremptory challenges he requested two additional "strikes" assigning only the reason that he had no more peremptory challenges. The second prospective juror after appellant exhausted his peremptory challenges was Donald Stith. After his voir dire examination of Stith, appellant again requested additional peremptory challenges without assigning any reason. The request was denied and Stith was sworn as a juror. At no time did the appellant state to the trial court that Stith was objectionable to him or contend that he was entitled to an extra peremptory challenge because of the court's ruling on his challenge for cause to Tilden. When the jury process was completed, co-defendant Barrientes had not exhausted his peremptory challenges.

On appeal appellant contends for the first time Stith was objectionable to him and that the court erred in denying his challenge for cause because Tilden was a former-police officer, had officer friends and indicated he would give "maybe a little" more credence to police-officer witnesses than others, etc.

He relies upon the rule that where an accused has been compelled to exhaust peremptory challenges and accept an objectionable juror because a challenge for cause was improperly overruled, there is error although the accused does not show in what manner the juror was objectionable to him, nor that the juror was unfair or partial. See *Wolfe v. State*, 147 Tex.Cr.R. 62, 178

S.W.2d 274 (1944) (Opinion on rehearing). See also *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr.App.1978), and cases there cited.

Article 35.16(a), V.A.C.C.P., reads in part:

"(a) A challenge for cause is an objection made to a particular juror, *alleging some fact which renders him incapable or unfit to serve on the jury.* A challenge for cause may be made by either the state or the defense for any one of the following reasons; . . .

"(1) * * *" (Emphasis supplied.)

■ Appellant's objection to Tilden was not a proper challenge for cause as he failed to allege some fact which rendered Tilden incapable or unfit to serve on the jury in accordance with the reasons set forth in Article 35.16, supra. The trial court was not apprised of the basis of the challenge and we cannot conclude the court erred in overruling the general objection made. Even if the objection had been sufficient under Article 35.16, supra, we express grave doubts that voir dire examination of Tilden shows that he was subject to challenge on the grounds now urged on appeal for the first time.

■ Most importantly, however, even if it could be argued that the challenge for cause was sufficient and the court erred in overruling it, the appellant has failed to bring himself within the rule in *Wolfe* upon which he relies. He was not caused to exhaust his peremptory challenges by any improper ruling on the challenge for cause. The prospective juror was excused by a peremptory challenge of the co-defendant who did not exhaust all of his peremptory challenges. The appellant did not lose a peremptory challenge as a result of the court's ruling. No harm has been shown. Appellant's contention is overruled.

The judgment is reformed to reflect life imprisonment as punishment and as reformed is affirmed.

ROBERTS, CLINTON and TEAGUE, JJ., concur in the result.