**Arthur Ben LEWIS, Jr., Petitioner,**

v.

**Harold J. CARDWELL, Warden, et al.,
Respondents.**

**Civ. A. No 71–76.**

United States District Court,
S. D. Ohio, E. D.

May 19, 1972.

**28**

Bruce A. Campbell, Campbell, Boyland & Schwarzwalder, Columbus, Ohio, for petitioner.

William J. Brown, Atty. Gen., Jeffrey L. McClelland, Asst. Atty. Gen., Columbus, Ohio, for respondents.

## OPINION AND ORDER

KINNEARY, District Judge.

Petitioner, a state prisoner, brings this action for a writ of habeas corpus under the provisions of Title 28, United States Code, Section 2241(c)(3).

This matter is before the Court on the petition, return of writ, briefs and exhibits of the parties, the bill of exceptions in State v. Arthur Ben Lewis, Jr., No. 3952 (Delaware Cty.C.P.Ct.1968) and an evidentiary hearing held on April 20, 1972.

On November 8, 1967, the Delaware County Grand Jury returned an indictment charging petitioner with the crime of murder in the first degree. He was tried before a jury on March 4–21, 1968, and found guilty with the recommendation of mercy. On March 29, 1968, he was sentenced to life imprisonment in the Ohio Penitentiary.

Petitioner appealed to the Fifth District Court of Appeals for Delaware County which affirmed the judgment of conviction. He then appealed to the Ohio State Supreme Court which, in State v. Lewis, 22 Ohio St.2d 125, 258 N.E.2d 445 (1970), also affirmed the judgment of conviction.

Petitioner alleges that he is in the custody of respondent in violation of the Constitution of the United States, in that:

1. His arrest was unlawful because it was predicated upon a warrant that had issued under §§ 2935.09, 2935.10, 2935.17 and 2935.19 of the Ohio Revised Code, which sections are unconstitutional on their face in that they:

 a) fail to provide that a judicial determination be made prior to issuance of a warrant;

 b) fail to provide that facts be set forth in the affidavit that would permit an impartial judicial determination as to the existence of probable cause for issuance of the arrest warrant;

 c) fail to require the officer to state his source, or to aver that such source had previously been reliable.

 The subsequent eliciting of the petitioner's statements and the seizure of his automobile incident to the arrest when entered as evidence in the trial of this cause served as a basis for his conviction, contravening the petitioner's rights under the Fourth and Fourteenth Amendments.

2. His interrogation and subsequent arrest and seizure of his automobile by a vigilante committee (Division of Criminal Activities—ostensibly at the direction of Deputy Sheriff Lavery) was in violation of his right of Fourteenth Amendment's procedural due process, where such committee, assigned

by the Ohio Attorney General, was, in actual point of law, operating without legal authority where the Attorney General had no such statutory appointive powers and the subsequent seizure of evidence as a result of this action by the Attorney General when entered as evidence during the trial of this matter served as a basis for petitioner's conviction.

3. His Fifth Amendment rights were infringed where the vigilante committee (Division of Criminal Activities) summoned the petitioner to the Office of the Attorney General, initiated an interrogation of the petitioner prior to having given him the warning required by Miranda, and that when the purported warning was given, he was not apprised of certain facts, i. e., that anything said can and will be used against him in court, or that an arrest warrant had been issued for his arrest, or that his conversation, prior to the warning as well as after, was being monitored by a hidden electronic eavesdropping apparatus thereby denying the petitioner his Sixth Amendment right to counsel during a critical stage of the proceedings, and the surreptitiously acquired statement when entered as evidence in the trial of the cause served as a basis of his conviction.

4. He was deprived of a fair trial where after the trial court overruled State's Exhibit 111, the trial court erred in permitting the State to present into evidence the hearsay contents of the exhibit in toto, by means of a witness for the State reciting verbatim therefrom; such testimony serving as a basis for conviction and violation of petitioner's rights under the Sixth and Fourteenth Amendments.

5. The warrantless seizure of his automobile, parked on a private lot one-half block from site of his arrest, for purpose of ascertaining as to whether said automobile had been an instrumentality of the crime, violated Fourth Amendment prohibition where such seizure was justified only after the seizure; (in theory of the State's case), further, the automobile was not seized contemporaneous in time and place with petitioner's arrest, and evidence seized therefrom served as a basis of his conviction.

6. He was deprived of any chance he may have had for a fair trial where a woman, whom the State alleged, by pre-trial press releases, was his 'second wife', was issued a subpoena by the State in such flamboyant manner as to maximize newspaper, radio and television coverage and, where, this 'witness' was never called to testify; and where the State with manifest intent, branded the petitioner as a 'beast' in the eyes of the jurors, by parading her through the courtroom after the jury was seated, and kept her within the eyesight of the jury by the seating arrangement provided by the State of Ohio; hence, the misconduct by the Office of the Prosecuting Attorney in perpetuating the prejudicial publicity which was crucial to, and denied the petitioner's right to a fair trial and served as a basis of his conviction by denying him the right of due process under the Fourteenth Amendment.

7. Hearsay evidence of the most flagrant kind was adverted to with the manifest intent of depriving him of his right to a fair trial where the contents of an unrelated telephone call was admitted under the trial court's misinterpretation of the hearsay rule and constituted a deprivation of petitioner's right of confrontation and cross examination under the Sixth Amendment.

8. His right to a fair and impartial trial by a jury free of prejudice was impaired where evidence, known to be incompetent when offered, was wrongfully admitted for consideration of the jury and served as a basis of conviction violating the petitioner's constitutional rights as provided by the Fourteenth Amendment.

9. The trial court's arbitrary limitation as to scope allowed in the direct examination of a defense witness militated against the fairness of the trial and served as a basis of his conviction, depriving him of his Sixth Amendment right to effective assistance of counsel and his Fourteenth Amendment's right to due process.

10. The trial court's denial of his Motion for a New Trial based upon newly discovered evidence was a flagrant abuse of the discretion lodged in that court and served to perpetuate petitioner's imprisonment for a crime of which he is innocent, denying him due process under the Fourteenth Amendment.

Each of the claims for relief will be considered below.

First, the Court will summarize the relevant facts underlying the judgment of conviction as they appear in the bill of exceptions in State v. Arthur Ben Lewis, Jr., No. 3952 (Delaware Cty.C. P.Ct.1968) and as found by this Court after the evidentiary hearing.

On July 19, 1967 at approximately 2:35 p. m., the body of Paul Radcliffe was found in the brush along the bank of the Olentangy River near the old Tilton building in Delaware County, Ohio. Radcliffe had been killed by multiple pellet wounds of the chest, right arm and right hip.

Delaware County Deputy Sheriffs arrived on the scene shortly after the discovery of the body. They, together with employees of the Bureau of Criminal Investigation and Identification (BCI), investigated the murder scene. Radcliffe's automobile, a 1963 Oldsmobile, was found over the bank of the Olentangy River in the brush near the victim. No weapon was found.

The investigators made casts of tire tracks found at the scene.[1] They also removed foreign paint scrapings from the right rear bumper and fender of Radcliffe's car.

Delaware County Sheriff Eugene Jackson requested the assistance of the Division of Criminal Activities of the Office of the Attorney General of Ohio to investigate the murder. In the succeeding months, the investigation was conducted by Delaware County Deputy Sheriff William Lavery and Chief Investigator Clyde Mann of the Division of Criminal Activities.

Early in the investigation it was learned that in May of 1967 a Columbus businessman, Jack Smith, had become interested in purchasing a business owned by petitioner, Graham's Auto Specialists. They had entered into a contract of purchase at $30,000.00 with a closing date of July 22, 1967. Smith employed Paul Radcliffe, an accountant, to look at petitioner's books for Graham's Auto Specialists.

On July 24, 1967, Deputy Lavery talked with petitioner at Graham's Auto Specialists. Lavery testified at the evidentiary hearing that he considered petitioner a suspect from that time forward.

Mann and Lavery talked with petitioner again on September 28, 1967. At this time the investigation had focused in on petitioner as the prime suspect. Mann called petitioner on October 9, 1967 and requested that he come to the offices of the Division of Criminal Activities at 40 S. 3rd Street, Columbus, Ohio for additional questioning.

On the morning of October 10, 1967 at approximately 8:00 a. m., Deputy Lav-

---

1. Cast #1 was of a Starfire Imperial tire made by the Cooper Tire & Rubber Co.

Cast #2 was of a safety model low profile tire made by U. S. Royal.

ery appeared before Delaware County Municipal Judge Thomas C. Clark and filed the following affidavit in support of an arrest warrant:

Before me, a Notary Public, personally came William B. Lavery, Deputy Sheriff, who, being duly sworn according to law, deposes and says, that one Arthur Ben Lewis, Jr., on or about the 19th day of July, 1967, at or about the hour of nine o'clock, A.M., within the State of Ohio, County of Delaware aforesaid and in the Township of Liberty unlawfully then and there did purposely, and of premeditated malice, kill Paul L. Radcliffe, then and there being a human being contrary to Section 2901.01 of the Revised Code in such case made and provided, and against the peace and dignity of the State of Ohio.

Judge Clark issued an arrest warrant for petitioner. The only sworn facts before the Municipal Judge were contained in the affidavit.

At the time he procured the arrest warrant, Lavery had knowledge of the following facts establishing probable cause to believe that petitioner murdered Paul Radcliffe on July 19, 1967 in violation of § 2901.01, Ohio Revised Code:

1. Ruth Burns and Alice Stone, residents of the area surrounding the murder site, heard gun shots between 8:00 a. m. and 8:30 a. m. on July 19, 1967.

2. After hearing the gun shots, Ruth Burns heard tires spinning on gravel and the sound of dry wood crackling. She then observed a tan GM product with a black top traveling toward Columbus on Route 315, which passes in front of her house. The automobile was similar in design to her 1966 Corvair.

3. Petitioner owned a beige or gold colored 1966 Pontiac.

4. Gold or beige colored paint was found on the rear bumper and fender of Radcliffe's 1963 Chevrolet.

5. It was Lavery's opinion from observing the murder scene that a vehicle had pushed Radcliffe's automobile over the Olentangy River embankment.

6. The Federal Bureau of Investigation laboratory reported that the paint found on the rear bumper and fender of Radcliffe's automobile was from a 1965 or 1966 GM product.

7. Mrs. Jack Smith received a telephone call between 9:00 a. m. and 9:30 a. m. on July 19, 1967. The caller identified himself as "Radcliffe." He said that the books for Graham's are in "A-1 condition." The caller concluded by saying that he was leaving town and wouldn't be back until Tuesday, July 25, 1967. Mrs. Smith, who had known the victim, said the caller was not Paul Radcliffe.

8. Paul Radcliffe could not have made the call because the observations of Ruth Burns and Alice Stone establish the time of death at around 8:30 a. m.

9. Only petitioner benefited by the information contained in the phone call.

10. Petitioner brought his car to the M & R Garage at approximately 12:00–12:30 p. m. on July 19, 1967 to arrange for repairs to damage to the front grille panel, hood, right front fender, left rear quarter panel and door, and left driver's door of his 1966 Pontiac. The repair work was performed July 20, 1967.

11. On the victim's desk calendar the notation "Call Ben Lewis" appeared on the page dated July 19.

At the time he obtained the arrest warrant for petitioner, Lavery believed petitioner's 1966 Pontiac had been used in the commission of the murder and he

wanted to seize the automobile.[2] Lavery did not attempt to obtain a search warrant for petitioner's 1966 Pontiac.

Lavery proceeded with the warrant to the Criminal Activities Division's offices at 40 S. 3rd Street, Columbus, Ohio. Petitioner arrived at the offices sometime after 10:00 a. m. At 10:30 a. m., investigator Mann began questioning petitioner. Petitioner signed a waiver of his right to remain silent and his right to the assistance of counsel at 10:40 a. m. From that time on the interrogation was recorded, without petitioner's knowledge, by a hidden tape recorder.

Although Lavery was present during the interrogation and other events of October 10, 1967, he did not execute the arrest warrant until approximately 5:00 p. m. in the evening. He testified at the evidentiary hearing that it was a "tactically" better "interrogation technique" to question petitioner before advising him that a warrant had been issued for his arrest.

The questioning covered petitioner's activities on the morning of July 19, 1967; the damage to his 1966 Pontiac; his contacts with Radcliffe prior to July 19, 1967; the type of guns he owned; and his financial condition. Several of petitioner's statements were potentially incriminating.[3] Taken as a whole, the statements were consistent with the defense presented at trial.[4]

The interrogation continued until around noon. Between 12:30 p. m. and 1:00 p. m., petitioner was taken to his home by the investigators and Deputy Lavery. There the investigators searched for a shotgun. Nothing was seized. Everyone returned to the offices of the Division of Criminal Activities.

At no time after his arrival at the Criminal Activities Division office around 10:00 a. m. was petitioner permitted to leave these premises. Furthermore, he had to obtain permission to use the telephone.

The questioning continued for a brief period following the return from petitioner's residence. Around 3:30 p. m., petitioner said he wanted to talk with his attorney. He was permitted to call David E. Tingley, who had previously represented him in civil matters. Mr. Tingley called Paul Scott with respect to representing petitioner. Mr. Tingley and Mr. Scott arrived at the offices of the Division of Criminal Activities at approximately 4:00 p. m. Mr. Scott conferred with petitioner. The interrogation did not continue.

Sometime after 5:00 p. m., Deputy Lavery formally executed the arrest warrant, taking custody of petitioner. As they were leaving the offices of the Criminal Activities Division, Lavery obtained possession of the keys to petitioner's 1966 Pontiac which was parked approximately one-fourth of a block away in a private parking lot open to the public. The manner in which Lavery obtained possession of the keys is in dispute.

At the hearing on a motion to suppress the fruits of a search of the automobile, Mann testified that he, Lavery and David Kessler [5] talked the matter

2. Lavery first considered petitioner a suspect on July 24, 1967 when he saw petitioner's gold colored 1966 Pontiac at Graham's Auto Specialists.

3. Petitioner's recounting of how the 1966 Pontiac was damaged varied from that he gave to the repairmen at the M & R Garage when he had the damage repaired. His statements concerning his financial status were relevant to the prosecution's theory that the murder was motivated by his desire to sell Graham's Auto Specialists to extricate himself from financial difficulties.

4. Throughout the questioning petitioner consistently maintained his innocence. As he did at trial, petitioner told Mann that he took his son to work at a swimming pool and then picked up some auto parts at Dixie International during the time the murder allegedly occurred.

5. Mr. Kessler was the Assistant Attorney General of Ohio in charge of the Criminal Activities Division. He later was designated a special Delaware County Prosecutor to assist in the prosecution of petitioner. He presented the State's case at petitioner's trial.

over and decided to impound the automobile. Mann recalled telling petitioner, probably prior to the arrival of Mr. Tingley and Mr. Scott, that he was going to impound the automobile because it was used in a felony. Mann testified that after his arrest, petitioner requested that his automobile be put in a police lot for safekeeping.[6] Mann then seized the automobile under the authority that it was used in the commission of a felony. Lavery's testimony was substantially the same as Mann's.

Mr. Tingley testified at the hearing on the motion to suppress that Mann told Mr. Scott that he wanted petitioner's automobile. Mr. Scott asked, under what authority? Mann replied that it was used in the commission of a felony. Mr. Scott then relinquished the keys, stating he was "not going to enter into a physical fight with [Mann] if [he was] taking custody of the automobile."

At the evidentiary hearing herein Mr. Scott and petitioner testified that around the time of the arrest, i. e., 5:00 p. m., petitioner gave Mr. Scott the keys to the automobile and a claim check for it, requesting Mr. Scott to see that his wife and family got the automobile. After the arrest, Mann demanded a briefcase containing personal papers belonging to petitioner. Mr. Scott refused. Mann also said that he was going to take the automobile. Mr. Scott testified that to avoid becoming involved in a physical confrontation, he gave the keys to Mann, telling him that he would "see [Mann] in court on a motion to suppress."

Mann and Lavery also testified at the evidentiary hearing. Their testimony did not materially differ from that at the hearing on the motion to suppress. Lavery did concede that he probably would have taken the automobile regard-less of whether or not petitioner had asked him to take it for safekeeping.

The automobile was impounded by the Columbus Police Department. Steve Molnar, Jr., a BCI lab technician, viewed the automobile on October 11, 1967 in the impounding lot. He searched the trunk and found a new Uniroyal tire. He observed that there were two almost new Hercules Safety Cream 855.14 tires on the front of the automobile. He noted that the right rear tire was made by U. S. Royal and could have made one of the cast impressions made at the murder scene. Molnar then took paint scrapings from the right rear and left front of the automobile. He was not acting pursuant to a search warrant.

At trial, Molnar testified that the foreign paint scrapings found on the right rear bumper and fender of Paul Radcliffe's 1963 Oldsmobile were beige painted over a grey primer which, in turn, was over a black primer next to metal. The paint samples taken from petitioner's car on October 11, 1967 were also beige painted over a grey primer, over a black primer next to metal. Molnar testified that it was his expert opinion that there was no difference in the color, texture or order of layering of the paint samples taken from the right rear bumper and fender of Radcliffe's automobile and the right rear and left front of petitioner's automobile.

Additional facts relevant to the decision will be set out below with respect to the specific claims for relief.

## I, II, III, and IV

Petitioner's first four claims for relief were not presented to the Fifth District Court of Appeals for Delaware County, Ohio or to the Ohio Supreme Court.

In Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438

---

6. Mann testified at the hearing on the motion to suppress that petitioner:

 asked me to have his car impounded, or put in a police lot for safekeeping, because the lot that he had it in, which was next door to our office, he didn't want it to sit there overnight, afraid somebody would ransack the car, and take any merchandise that he had in the car. He asked me to impound the car for safekeeping.

(1971), the United States Supreme Court held that a federal claim for relief must be fairly presented to the state courts before it may be considered by a United States District Court in habeas corpus. See, 28 U.S.C. § 2254(b), (c). A state prisoner cannot bypass the state courts. But a petitioner need not pursue state court remedies if there is "an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of prisoners." 28 U.S.C. § 2254(b).

Petitioner could have presented these claims for relief to the Ohio courts in his direct appeal. At the evidentiary hearing in this Court, Mr. Scott and petitioner testified that petitioner sought to have the issues presented to the Ohio courts but that Mr. Scott, in his professional judgment, decided against raising them.

Fifty per cent of Mr. Scott's practice is in the area of criminal law. He is a respected and competent trial attorney both in the criminal and civil fields. His decision not to raise the issues in the direct appeal represents his best professional judgment which is within the range of reasonably competent judgment constitutionally mandated. See, McMann v. Richardson, 397 U.S. 759, 772–773, 90 S.Ct. 1441, 25 L.Ed. 2d 763 (1970).

On the other hand, there is no evidence that petitioner decided to voluntarily forego his right to present these claims to the Ohio courts.[7]

The question remains: is there an available Ohio procedure in which petitioner can raise the first four claims for relief alleged herein. Respondent asserts that petitioner has available the remedy of a delayed appeal from the judgment of conviction to the Fifth District Court of Appeals under the provisions of § 2953.05, Ohio Revised Code. Alternatively, respondent contends petitioner has available the remedy of a petition to vacate sentence under the provisions of § 2953.21 et seq., Ohio Revised Code.

A prisoner is not required to undertake a futile exhaustion of State remedies. See, e. g., Terry v. Wingo, 454 F.2d 694 (6th Cir. 1972); Woodards v. Cardwell, 430 F.2d 978 (6th Cir. 1970), cert. denied, 401 U.S. 911, 91 S.Ct. 874, 27 L.Ed.2d 809 (1971); Allen v. Perini, 424 F.2d 134 (6th Cir. 1970), cert. denied, 400 U.S. 906, 91 S.Ct. 147, 27 L.Ed.2d 143 (1970); Lucas v. Michigan, 420 F.2d 259, 261 (6th Cir. 1970); Duke v. Wingo, 386 F.2d 304, 306 (6th Cir. 1967), cert. denied, 397 U.S. 1013, 90 S.Ct. 1243, 25 L.Ed.2d 426 (1970).

Presenting the claims for relief in a post-conviction petition would be futile. In State v. Duling, 21 Ohio St.2d 13, 254 N.E.2d 670 (1970), the Ohio Supreme Court held that constitutional claims could not be considered in proceedings under § 2953.21 et seq., Ohio Revised Code if they have already been *or could have been* fully litigated on direct appeal. The first four claims for relief herein could have been raised on direct appeal, therefore post-conviction relief is unavailable.[8]

The Court now turns to the question of the availability of a delayed appeal.

---

7. Whether or not he waived his right to present these claims to the Ohio courts is governed by Ohio law. But, assuming these claims for relief raise constitutional questions, petitioner's conduct did not amount to "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). He sought to have the claims presented to the Ohio courts.

8. In the instant case, petitioner and his counsel knew the issues could have been raised on direct appeal. In *Duling*, the constitutional claim had not yet been recognized by the courts at the time of direct appeal and was consequently unknown to the prisoner and his attorney at the time of appeal. Yet, the Ohio Supreme Court held that the unrecognized constitutional claim "could" have been raised on direct appeal. The prisoner was barred from raising the claim in post-conviction proceedings.

The general rule is that an Ohio prisoner who was convicted after trial is required to raise his claims for relief in a direct or delayed appeal under the provisions of § 2953.05, Ohio Revised Code to exhaust his available state court remedies as required by 28 U.S.C. § 2254(b), (c). *See*, Mackey v. Koloski, 413 F.2d 1019 (6th Cir. 1969). Section 2953.05, Ohio Revised Code provides, in relevant part:

> Appeal . . . may be filed as a matter of right within thirty days after judgment and sentence or from an order overruling a motion for a new trial. . . . After the expiration of the thirty day period . . . such appeal may be taken only by leave of the court to which the appeal is taken.

Ohio courts have uniformly held that a defendant must show good cause why he did not file a direct appeal to be granted leave to file a delayed appeal. State v. McGahan, 86 Ohio App. 283, 284, 88 N. E.2d 613 (Franklin Cty.Ct.Apps.1949); Ex parte Hertz, Ohio App., 139 N.E.2d 645, 74 Ohio Law.Abst. 71 (Franklin Cty.Ct.Apps.1953). *See*, State v. Sims, 27 Ohio St.2d 79, 272 N.E.2d 87 (1971); Toledo v. Reasonover, 115 Ohio App. 434, 185 N.E.2d 500 (Lucas Cty.Ct. Apps.1962); State v. Steel, Ohio App., 199 N.E.2d 24, 30 Ohio Ops.2d 41, 42 (Ross Cty.Ct.Apps.1964).

This Court can find no reported case deciding whether a delayed appeal lies to raise issues which were not raised on direct appeal.

This Court believes that § 2953.05, Ohio Revised Code should be construed liberally in favor of granting a remedial process through which constitutional questions may be raised. *See*, Case v. Nebraska, 381 U.S. 336, 85 S.Ct. 1486, 14 L.Ed.2d 422 (1965).

▪ The existing Ohio case law is consistent with this interpretation. Therefore, the Court concludes that if petitioner can show good cause why these issues were not presented on direct appeal, he has available the state court remedy of a delayed appeal. *But cf.*, Woodards v. Cardwell, *supra*.

▪ The Court holds that petitioner has not exhausted his available state court remedies with respect to the first four claims for relief as required by 28 U.S.C. § 2254(b), (c).

## V

We reach now the fifth claim for relief. Petitioner contends the warrantless seizure of his 1966 Pontiac, its subsequent search and resultant seizure of paint scrapings, and the admission of evidence and testimony relating to analysis of the paint samples was in violation of the Fourth and Fourteenth Amendments.[9]

Respondent argues that the search was justified either on the theory that it was incident to a valid arrest or because the officers had probable cause to believe the car was an instrumentality of a crime. If these arguments fail, respondent alleges that petitioner voluntarily surrendered the keys to the automobile and requested that the officers take the car into custody. Finally, no items were seized from the interior of the car. The exterior of the automobile was in plain view and consequently the paint scrapings were subject to seizure because the officers had probable cause to believe the automobile was used in the commission of a crime.[10]

---

9. In addition to taking paint samples, Molnar opened the trunk and observed a Uniroyal tire. He also noted the make of all the tires on the automobile. A photograph was taken of the automobile and introduced into evidence at trial. Petitioner contends the admission of this testimony and evidence also violated the Fourth and Fourteenth Amendments.

10. Respondent also apparently argues that there was no search and seizure because the only thing seized—paint—was from the exterior of the car. No cases are cited supporting this novel proposition. Admittedly, testimony describing the exterior color of the car would not run afoul the Fourth Amendment if the witness had lawfully been in a position to observe

Petitioner's fifth claim for relief has been raised at every stage of the Ohio proceedings. After the hearing on the motion to suppress, the Delaware County Common Pleas Court made no detailed findings of fact. The Common Pleas Court made the general finding that "the car was seized, impounded and searched because of the crime for which the defendant was arrested. . . . " Upon consideration of the evidence as a whole the Common Pleas Court concluded:

It appears to this court that it was reasonable for law enforcement officers to immediately seize a car which their investigation gave them reasonable cause to believe it had been used in the commission of a felony charge. The car was in the possession or constructive possession of the defendant; he had the keys and parking ticket for it. It was on a public parking lot adjacent to the building which public state offices are located and where the defendant had just been arrested.

This is not a case in which a person's home or private structure has been unreasonably invaded. This is not a case in which an individual's person has been unreasonably searched.

In this court's opinion the seizure of this car was incident to a lawful arrest. In this court's opinion subsequent search of this car was a reasonable search of a legally impounded vehicle and was incidental to the crime for which the defendant was arrested.

The Fifth District Court of Appeals for Delaware County on consideration of petitioner's appeal held:

Defendant-appellant sets forth ten assignments of error. We have carefully examined the record, assignments of error, bill of exceptions, heard the oral arguments of counsel, and find no error prejudicial to the defendant-appellant.

The Ohio Supreme Court found that petitioner's automobile was used as an instrumentality of a crime:

In the instant case, the investigating authorities had reasonable grounds to believe that the car had been used in the furtherance of the commission of the crime; that because it was used to push the victim's car over the river embankment, it was an instrumentality of the crime. Therefore, two samples were taken from the exterior of the car to compare the paint found on decedent's car.

The Ohio Supreme Court then held:

that the examination by the police of an automobile which is an instrumentality of a crime, for evidence in connection with the crime in which the automobile was used, is not an unlawful search and seizure even though the examination is conducted at a time and place remote from the time and place of the arrest of the owner and seizure of the automobile.

Since the seized car was an instrumentality used in the crime, the authorities had as much right to examine it as they would to examine a weapon claimed to have been used in the commission of a crime.

Each of the above courts was presented with the argument that petitioner had consented to the search by voluntarily relinquishing the keys to the officers. The consent rationale was not adopted by any Ohio court. However, respondent again asserts that petitioner's "consent" to police officers taking custody of the automobile is a factor which contributes to the lawfulness of the search and seizure of the automobile.

■ The following general rules govern the determination of whether a defendant has given his consent to a search:

1. The government has the burden of proving consent was given.

---

its color. However, the intrusion herein was not limited to an observation of the exterior of the automobile. A search was

conducted of the layers of paint beneath the visible surface of the vehicle.

Bumpers v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L. Ed.2d 797 (1968); Rosenthall v. Henderson, 389 F.2d 514, 515–516 (6th Cir. 1968); Simmons v. Bomar, 349 F.2d 365 (6th Cir. 1965); Kovach v. United States, 53 F.2d 639 (6th Cir. 1931); Judd v. United States, 89 U.S.App. D.C. 64, 190 F.2d 649, 651 (1951); Watson v. United States, 101 U.S. App.D.C. 350, 249 F.2d 106, 108 (1957); Villano v. United States, 310 F.2d 680, 684 (10th Cir. 1962); United States v. Page, 302 F.2d 81, 83 (9th Cir. 1962); State v. McCarthy, 20 Ohio App. 2d 275, 284–285, 253 N.E.2d 789 (Cuyahoga Cty.Ct.Apps.1969).

2. The prosecution must demonstrate that the consent is uncontaminated by any duress or coercion, either express or implied. Simmons v. Bomar, *supra*; Judd v. United States, *supra*; United States v. Page, *supra*; Watson v. United States, *supra*.

3. The consent must be "unequivocal, specific and intelligently given." Simmons v. Bomar, *supra*; Kovach v. United States, *supra*; Judd v. United States, *supra*; United States v. Page, *supra*; Villano v. United States, *supra*.

4. If the defendant was in custody, there must be clear and positive testimony that he voluntarily consented to the search. Catalanotte v. United States, 208 F.2d 264 (6th Cir. 1963); Judd v. United States, *supra*; United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962), cert. denied 372 U.S. 906, 83 S.Ct. 717, 9 L.Ed.2d 716 (1963); United States v. Page, *supra*; *see also*, Hubbard v. Tinsley, 350 F.2d 397, 398 (10th Cir. 1965).

5. Courts indulge every reasonable presumption against the waiver of fundamental constitutional rights. United States v. Page, *supra*;

Weed v. United States, 340 F.2d 827, 829 (10th Cir. 1965); *see generally*, Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L. Ed. 1461 (1938).

6. Consent to search is not lightly to be inferred. Simmons v. Bomar, *supra*; Rosenthall v. Henderson, *supra*; United States v. Como, 340 F.2d 891, 893 (2d Cir. 1965).

7. Whether consent was given is an issue of fact which must be determined by the United States District Court in a habeas corpus action where there is no state court finding of fact which complies with the requirements of 28 U.S. C. § 2254(d). Rosenthall v. Henderson, *supra*.

Cases collected in Anno: Validity of consent to search given by one in custody of officers, 9 A.L.R.3d 858 (1966 and 1971 Supp.) indicate that if a defendant who has been stopped in an automobile either gives the keys to the automobile to officers for the express purpose of facilitating a search of the automobile, McDonald v. United States, 307 F.2d 272 (10th Cir. 1962); Grice v. United States, 146 F.2d 849 (4th Cir. 1945); Robinson v. United States, 325 F.2d 880 (5th Cir. 1964); United States ex rel. Anderson v. Rundle, 274 F.Supp. 364 (E.D.Pa.1967), or tells the officers to go ahead and search the automobile because he has nothing to hide, Hughes v. United States, 377 F.2d 515 (9th Cir. 1967); Gorman v. United States, 380 F. 2d 158 (1st Cir. 1967); United States v. Bonano, 390 F.2d 647 (3d Cir. 1968) the consent to search is valid. But, when police officers announce that they are going to seize the automobile and the defendant then hands over the keys to it, the consent is invalid. Weed v. United States, *supra*; *also see*, United States v. Nikrasch, 367 F.2d 740 (7th Cir. 1966); United States v. Barton, *infra*.

Viewing the evidence in the light most favorable to the State, petitioner did not clearly and unequivocally consent to the seizure and search of the automobile.

The testimony of Deputy Lavery and investigator Mann established, at most, that petitioner consented to their taking custody of the car for safekeeping. There is no evidence that petitioner consented, expressly or impliedly, to a seizure of the automobile for purposes of a search. All of the evidence demonstrates petitioner desired that the automobile be maintained in a safe condition for the (immediate or ultimate) use of his wife and family.[11] And, in fact, the arresting officers asserted that they were seizing the automobile on a different ground—that it was an instrumentality used in the commission of a felony. By inference, they rejected petitioner's alleged "consent" because it was too limited.

The Court further finds the defendant's counsel, Mr. Scott, who is experienced in the practice of criminal law, did everything within his ability to protect petitioner's Fourth Amendment rights.

■ Under the circumstances of this case, the Court holds that petitioner did not consent to the seizure and subsequent search of his automobile.

The Court now turns to the two main justifications asserted for the warrantless search and seizure of petitioner's automobile: (1) it was seized incident to petitioner's arrest, and (2) it was seized as an instrumentality of the murder in plain view of the officers.

In Coolidge v. New Hampshire, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971), Mr. Justice Stewart succinctly stated the governing principle of search and seizure:

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifi-

cally established and well-delineated exceptions."[5] The exceptions are

5. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576.

"jealously and carefully drawn,"[6] and

6. Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514.

there must be "a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative."[7]

7. McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153.

"[T]he burden is on those seeking the exemption to show the need for it."[8]

8. United States v. Jeffers, 342 U.S. 48, 51, 72 S.Ct. 93, 96 L.Ed. 59.

See also, Coolidge v. New Hampshire, *supra*, 403 U.S. at 481, 484, 91 S.Ct. 2022, 29 L.Ed.2d 564; United States v. Nelson, 459 2d 884 (6th Cir., 1972) (citing the language from Justice Stewart's opinion at 403 U.S. pp. 454–455, 91 S.Ct. 2022 approvingly).

■ Thus, this Court starts with the premise that the warrantless search and seizure herein was unconstitutional, and its fruits inadmissible at trial, unless the State can prove that it fell within one of the well-delineated exceptions to the general rule. Each justification asserted will be discussed in turn.

A. *Search Incident to an Arrest.*

■ In Chambers v. Maroney, 399 U.S. 42, 47, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court recognized that a search cannot be justified as incident to an arrest if it is not contemporaneous in time and place to the arrest. *See also*, Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968). Nonetheless, if the vehicle is seized at the time of arrest and the circumstances of the arrest

---

11. The State implies, but does not support by decisional law, that once the automobile was in police custody they could do with it what they would. This view was rejected in Coolidge v. New Hampshire, 403 U.S. 443, 468, 471, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971). Assuming the auto-

mobile was lawfully in police custody for safekeeping, the State was not justified in taking paint scrapings from the vehicle. Such an intrusion is not a normal or necessary result of impounding a vehicle. *Cf.*, Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968).

would have justified a search of the vehicle incident to the arrest, a search of the vehicle conducted at a later time and place is reasonable under the Fourth Amendment. Chambers v. Maroney, *supra,* 399 U.S. at 52, 90 S.Ct. 1975, 26 L. Ed.2d 419.

██ The search of petitioner's automobile was not incident to his arrest because it was conducted at a time and place remote from it. The question remains, could the State have seized the car incident to the arrest, thus placing the search within the *Chambers* exception.

The rationale permitting warrantless searches incident to an arrest rests upon the conclusion that one or both of the following factors precluded the police from obtaining a search warrant and made it reasonable for the officers to search the automobile rather than obtain a warrant:

a. The circumstances establishing probable cause for search of the vehicle were unknown to the police prior to the defendant's apprehension.

b. The vehicle is mobile, and if officers delay to obtain a search warrant, one of defendant's confederates will remove the automobile and prevent the police from searching for the object or objects subject to seizure.

Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Chambers v. Maroney, *supra,* 399 U.S. at 50–51, 90 S.Ct. 1975, 26 L.Ed.2d 419.

Cases involving asserted searches of automobiles incident to an arrest fall into four factual categories:

1. Defendant lawfully arrested inside an automobile and the arresting officers had probable cause to believe that contraband or other evidence of a crime was concealed in the automobile.

 Chambers v. Maroney, *supra*; Arwine v. Bannan, 346 F.2d 458 (6th Cir. 1965), cert. denied 382 U.S.

882, 86 S.Ct. 175, 15 L.Ed.2d 123 (1965); United States v. Dento, 382 F.2d 361 (3d Cir. 1967), cert. denied 389 U.S. 944, 88 S.Ct. 307, 19 L.Ed.2d 299, rehearing denied 389 U.S. 997, 88 S.Ct. 493, 19 L. Ed.2d 502 (1967).

2. Defendant lawfully arrested at or near the scene of a crime soon after its commission, and the police had probable cause to believe that contraband or other evidence of a crime was concealed in the automobile which was parked at or near the scene of the crime. Other known accomplices are still at large.

 United States v. Mazzochi, 424 F. 2d 49 (2d Cir. 1970); Moodyes v. United States, 400 F.2d 360 (8th Cir. 1968), cert. denied 397 U.S. 998, 90 S.Ct. 1141, 25 L.Ed.2d 407 (1970); *Cf.* United States v. Roth, 430 F.2d 1137 (2d Cir. 1970), cert. denied 400 U.S. 1021, 91 S.Ct. 583, 27 L.Ed.2d 633 (1970); Harris v. Stephens, 361 F.2d 888 (8th Cir. 1966), cert. denied 386 U.S. 964, 87 S.Ct. 1040, 18 L.Ed.2d 113 (1967).

3. Defendant arrested lawfully some time after the commission of the offense (usually a day or more) and at a place removed from the vehicle searched. Police had probable cause to believe that contraband or other evidence was concealed in the automobile.

 United States v. Marti, 421 F.2d 1263 (2d Cir. 1970); Staples v. United States, 320 F.2d 817 (5th Cir. 1963); United States v. Stoffey, 279 F.2d 924 (7th Cir. 1960); Williams v. United States, 323 F. 2d 90 (10th Cir. 1963), cert. denied, 376 U.S. 906, 84 S.Ct. 659, 11 L.Ed.2d 605 (1964); Derby v. Cupp, 302 F.Supp. 686 (D.Ore. 1969); United States v. Barton, 282 F.Supp. 785 (D.Mass.1967); Conti v. Morgenthau, 232 F.Supp. 1004 (S.D.N.Y.1964); Lucas v. Mayo, 222 F.Supp. 513 (S.D.Tex.

1964) ; Commonwealth v. Togo, 248 N.E.2d 285 (1969). *But see,* Drummond v. United States, 350 F.2d 983 (8th Cir. 1965), cert. denied, Castaldi v. United States, 356 Mass. 60, 384 U.S. 944, 86 S. Ct. 1469, 16 L.Ed.2d 542 (1966) ; McCoy v. Cupp, 298 F.Supp. 329 (D.Ore.1969) ; United States v. Francolino, 367 F.2d 1013 (2d Cir. 1966), cert. denied 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967) ; Browning v. United States, 366 F.2d 420 (9th Cir. 1966).

4. Defendant arrested without probable cause and his automobile searched.

Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968).

Searches made in the first two categories have been held to be reasonable under the Fourth Amendment. Cases falling within the fourth category are clearly unconstitutional because the searches were made without probable cause. Searches in the third category have generally been held invalid.

The United States Supreme Court recently considered a factual pattern falling within the third category in Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The facts in *Coolidge* are substantially identical to those in the instant case. Coolidge was the prime suspect in a murder investigation. Police talked with him on several occasions. Eventually, they obtained an arrest warrant for Coolidge and a search warrant for his automobile. The warrants were invalid, but the officers did have probable cause to arrest Coolidge without a warrant. Coolidge was arrested in his home pursuant to an invalid warrant and his automobile, which was parked outside his home in the driveway, was seized under an invalid warrant. The Supreme Court held that under its decisions prior to Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which substantially restricted the scope of searches incident to an arrest, the seizure of the car the night of Coolidge's arrest and its search several days later was not incident to an arrest.

Assuming that the arrest herein was lawful,[12] the search of petitioner's car was not incident to the arrest within the exception created by *Chambers.* The automobile was not in petitioner's immediate possession or control at the time of the arrest. *Cf.,* United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L. Ed. 653 (1950).

Neither of the two reasons advanced to justify searches incident to an arrest were existent. See pp. 39, 40, *supra.* The first condition was not met because the reasons establishing probable cause to search the automobile were known to officers days, if not weeks, prior to its seizure and subsequent search. The second condition was not met because the officers knew the whereabouts of the car prior to its search and seizure. They could have obtained a warrant at any time, including the morning of October 10, 1967 or any time following petitioner's arrest. There was no danger a confederate would remove the vehicle and destroy evidence. The murder occurred July 19, 1967. Petitioner was first in-

12. The affidavit in support of the arrest warrant merely recited the statutory elements of first degree murder. It contained *no facts* from which a magistrate could conclude that there was probable cause to believe petitioner had committed the crime. The affidavit was insufficient to support the issuance of the warrant. Whiteley v. Warden, 401 U.S. 560, 91 S. Ct. 1031, 28 L.Ed.2d 306 (1971) ; United States v. Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ; Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L. Ed.2d 723 (1964) ; Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L. Ed.2d 887 (1964) ; Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 (1960) ; Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L. Ed.2d 1503 (1958).
But the facts known to the arresting officer, see p. 31, *supra,* were sufficient to establish probable cause for the arrest.

terviewed July 24, 1967. He was again interviewed on September 28, 1967. He knew that he was a prime suspect when he was requested to meet with investigators on October 10, 1967. Petitioner had already been afforded ample opportunity to destroy evidence. If there were any further danger that a confederate would destroy evidence following petitioner's arrest, the State had ample opportunity to obtain a search warrant and eliminate the risk.

██ The Court holds that the search of petitioner's automobile was not incident to his arrest and did not fall within the *Chambers* exception to the prohibition against unwarranted searches. *See,* Coolidge v. New Hampshire, 403 U.S. *supra,* at 455–457, 473–484, 91 S.Ct. 2022, 29 L.Ed.2d 564; Cook v. Johnson, 459 F.2d 473 (6th Cir., 1972).

B. *Instrumentality.*

The Ohio Supreme Court held that the automobile was subject to seizure as an instrumentality of the murder which was in plain view. See p. 36, *supra.* This theory was also rejected by the United States Supreme Court in *Coolidge.*

The instrumentality theory assumes that any object used in the commission of a crime may be seized *at any time* without a warrant as long as the officers have probable cause to believe that the object was used in the commission of a crime and the officers are lawfully in a position to view the object.[13] See, State v. Lewis, 22 Ohio St. *supra* at 128–130, 258 N.E.2d 445 and the cases cited therein.

██ In rejecting this theory, the United States Supreme Court held that all warrantless searches are *per se* unreasonable absent "exigent circumstances" and that when police plan to seize an automobile prior to the time of arrest but fail to obtain a valid warrant, the search violates the Fourth Amendment. Coolidge v. New Hampshire, 403 U.S. *supra* at 478, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564. The police cannot seize an automobile on the theory that it is an instrumentality of a crime which is in plain view in calculated disregard for the Fourth Amendment requirement that application be made to a judicial officer for a search warrant absent exigent circumstances.[14]

██ The Court holds that the seizure and subsequent search of petitioner's automobile cannot be justified on the grounds that it was seized in plain view as an instrumentality of the murder. (Coolidge v. New Hampshire, 403 U.S. *supra,* at 464–473, 478, 481, 484, 91 S.Ct. 2022, 29 L.Ed.2d 564; Cook v. Johnson, *supra.*

There were no exigent circumstances permitting the warrantless search of petitioner's automobile. Therefore, the Court holds that the fruits of the search should have been excluded from evidence at trial and were erroneously admitted into evidence in violation of the Fourth and Fourteenth Amendments.

██ The error requires the issuance of the writ of habeas corpus, because the Court cannot declare that the admission into evidence of the paint scrapings was harmless beyond a reasonable

---

13. In *Coolidge,* the Supreme Court recognized that such a seizure would be justified if the object came into view inadvertently while officers were in hot pursuit of a suspect, Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), incident to a lawful arrest, Chimel v. California, 395 U.S. 752, 762–763, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969), or on an occasion unconnected with an arrest or search when an officer inadvertently observes an incriminating object, Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). Coolidge v.

United States, 403 U.S. *supra* at 465–466, 91 S.Ct. 2022, 29 L.Ed.2d 564.

14. Respondent's contention that officers were lawfully in the presence of the automobile to view its exterior because petitioner "consented" to their taking custody of it is irrelevant to a determination of this issue. Assuming officers were legally in position to view the automobile, they could not claim "exigent circumstances" when they had intended to search the automobile for some time prior to the arrest, yet failed to obtain, or even attempt to obtain, a search warrant.

doubt.[15] Chapman v. California, 386 U. S. 18, 21–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Petitioner's conviction rested entirely upon circumstantial evidence. The laboratory analysis of the paint scrapings taken from petitioner's car and the expert's opinion that there was no difference in color, texture or order of layering of the paint from petitioner's automobile and the foreign paint found on the victim's automobile was an important link in the prosecution's case. The evidence was offered to prove that petitioner was at the murder scene and had used his automobile to push the victim's automobile over the embankment.

Under these circumstances, the Court cannot say that the evidence did not contribute to petitioner's conviction. Chapman v. California, *supra*; Rosenthall v. Henderson, 389 F.2d *supra* at 516.

Therefore, the Court holds that petitioner's fifth claim for relief is meritorious.

### VI

Petitioner alleges that the State denied him his right to a fair trial when the prosecutor issued a news release announcing that the prosecution had subpoenaed Mrs. Betty Cummins Lewis, petitioner's "other wife," as a witness, but subsequently did not call her as a witness.

The evidence at the evidentiary hearing was that newspaper articles did appear the week before the trial stating that the State's first subpoena was issued for Mrs. Betty Cummins Lewis. Later, the issuance of other subpoenas were not announced individually.

The State intended to call Betty Cummins Lewis to prove petitioner's indebtedness. During the trial, the trial court admonished the prosecutor to avoid getting into the alleged relationship between Mrs. Betty Cummins Lewis and petitioner if she was called to the stand. The State announced to the court its intention to call her, but after a recess decided that it had already presented sufficient evidence of petitioner's indebtedness and did not, in fact, call her as a witness.

■ The Court has carefully reviewed the evidence offered by petitioner to prove this allegation and concludes that there was not such a probability of prejudice from the pretrial publicity as to prevent a fair and impartial trial by jury. *See*, Estes v. Texas, 381 U.S. 532, 542–543, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Sheppard v. Maxwell, 384 U.S. 333, 350, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Further, there is no evidence that the State knowingly engaged in tactics calculated to deprive the petitioner of his right to a fair trial. *See*, Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935); Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); Alcorta v. Texas, 355 U.S. 28, 78 S.Ct. 103, 2 L.Ed.2d 9 (1957); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

Therefore, the Court holds that the sixth claim for relief is without merit, and therefore it is denied.

### VII

Petitioner objects to the admission into evidence of the hearsay testimony

---

15. The only evidence seized was the paint scrapings from the right rear and left front of the automobile. Steve Molnar, Jr., the BCI lab technician who seized the paint from the automobile also opened the trunk. At trial he testified that he observed a new Uniroyal tire. It was not seized. This testimony was not critical to the State's case. It was merely cumulative. The clerk who sold the two Hercules Safety Cream 855.14 tires found on the front of petitioner's 1966 Pontiac and the mechanic who put them on and took off two almost new Uniroyal tires and placed them in the trunk both testified at trial.

of Mrs. Jack Smith that she received a call from a person who identified himself as "Radcliffe." [16] In State v. Lewis, 22 Ohio St.2d 125, 131–134, 258 N.E.2d 445 (1970), the Ohio Supreme Court held that the testimony was admissible under Ohio law to establish the fact that the phone call was made but not to establish the truth of the caller's statements. The testimony was admitted at trial for that permissible purpose.

 The Confrontation Clause does not constitutionalize the rules governing the admission of hearsay evidence. Each State may establish its own rules of evidence. The Confrontation Clause is not a mechanism by which federal courts propound state court rules of evidence. Dutton v. Evans, 400 U.S. 74, 80, 86, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); Cf. Spencer v. Texas, 385 U.S. 554, 563–564, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). A United States District Court does not sit as a court of appeals to review allegations of state trial court error. See, Reese v. Cardwell, 410 F.2d 1125 (6th Cir. 1969).

 There was no violation of the Confrontation Clause. Mrs. Smith testified under oath and was available for cross-examination. The jury had an opportunity to view her demeanor and judge her credibility. This is all the confrontation clause requires under the circumstances. California v. Green, 399 U.S. 149, 158–159, 90 S.Ct. 1930, 26 L. Ed.2d 489 (1970). The truth or falsity of the extra judicial declarant's statement that he had examined the books, found them in A–1 condition, and was going out of town was not at issue. Therefore, petitioner was not deprived of his right to cross-examine the caller.

The Court holds that petitioner's seventh claim for relief is without merit.

## VIII, IX

Petitioner's eighth claim for relief is an allegation that the trial court erroneously admitted incompetent and irrelevant testimony into evidence. His ninth claim for relief is that the trial court erred in arbitrarily limiting defense counsel in the scope of his direct examination of a defense witness. Both of these claims for relief are allegations of State trial court error.

 Errors in the admission of evidence committed by a state trial court, which do not violate any specific constitutional guarantee, are not cognizable in habeas corpus. See, Reese v. Cardwell, supra; Scalf v. Bennett, 408 F.2d 325 (8th Cir. 1969), cert. denied, 396 U.S. 887, 90 S.Ct. 175, 24 L.Ed.2d 161 (1969); Crisafi v. Oliver, 9 Cir., 396 F.2d 293 (1968), cert. denied, 393 U.S. 889, 89 S. Ct. 208, 21 L.Ed.2d 167 (1968); Durham v. Haynes, 368 F.2d 989 (8th Cir. 1968); Trujillo v. Tinsley, 333 F.2d 185 (10th Cir. 1964), see also, Ballard v. Howard, 403 F.2d 653 (6th Cir. 1968); Fernandez v. Klinger, 346 F.2d 210 (9th Cir. 1965), cert. denied, 382 U.S. 895, 86 S.Ct. 191, 15 L.Ed.2d 152 (1965); Edmondson v. Warden, 335 F.2d 608 (4th Cir. 1964).

 The errors alleged in the eighth and ninth claims for relief are of State law and they do not amount to a deprivation of a specific constitutional right.

Therefore, the Court holds that the claims for relief numbered eight and nine are without merit, and therefore they are denied.

## X

 Petitioner's final claim for relief is that newly discovered evidence entitled him to a new trial.

---

16. At trial, Mrs. Smith testified that she had received a telephone call between 9:00 a. m. and 9:30 a. m. on July 19, 1967 from a person who identified himself as "Radcliffe" or "Mr. Radcliffe." She testified, over objection, that the caller said: "I went over the books last night and this morning. Everything is in A–1 shape [or condition]. I am going out of town, and I won't be back until Tuesday." Mrs. Smith testified that the caller was not Paul Radcliffe.

This claim is a matter of State law and was fully and fairly considered by the Ohio Supreme Court.

There is a suggestion in petitioner's brief that law enforcement officers or the prosecution may have suppressed the potentially exculpatory evidence. *See,* Brady v. Maryland, *supra*; Giglio v. United States, *supra*.

The evidence adduced at the evidentiary hearing is as follows. In May, 1967, Paul Radcliffe told Harrison S. Berlin, a client, that he had been threatened by a man with a shotgun. Mr. Radcliffe gave no details of the threat. He did not say where or when the threat occurred. Shortly after the murder, Mr. Berlin called the Franklin County Sheriff's Office and reported his earlier conversation with Mr. Radcliffe. Det. Samuel Powers of the Franklin County Sheriff's Office received the report of the threat. He did not consider it important because neither the time nor place of the incident was known. He did tell Deputy Lavery about the report, although he could not recall whether he ever knew Mr. Berlin's first name.

On July 25, 1967, an article appeared in the Columbus *Dispatch* reporting the May threat incident in detail. Jay Gibian, the newsman who wrote the article, testified at the evidentiary hearing that he had been told of the threat by Deputy Lavery and Det. Powers. Mr. Gibian never knew the name of the person who made the report of the threat to the Franklin County Sheriff's Office.

Before trial, Paul Scott talked with Deputy Lavery about the reported May threat on Radcliffe's life. Deputy Lavery told Mr. Scott that the report of the threat was made by a person named Berlin. Lavery may have said "Roger Berlin." Mr. Scott testified that he didn't believe Deputy Lavery had attempted to mislead him.

The defense subpoenaed Roger Berlin at trial because he would not talk to Mr. Scott prior to trial. Roger Berlin was called as a witness but gave no testimony relevant to the case. Mr. Scott then learned that Roger Berlin had a brother, Harrison. The defense did not subpoena Harrison Berlin.

The Court finds that there was no deliberate misrepresentation regarding the identity of Harrison Berlin as the person who reported a May, 1967 threat on Paul Radcliffe's life to the Franklin County Sheriff's Office. Therefore, the Court concludes that petitioner was not deprived of any right under the Constitution of the United States.

The Court holds that petitioner's tenth claim for relief is without merit.

Whereupon, the Court holds that the petition is without merit with respect to the claims for relief numbered 1–4, 6–10, and therefore it is denied with respect to those claims. The Court further holds that the petition is meritorious with respect to the fifth claim for relief, and therefore it is granted with respect to that claim.

Accordingly, it is ordered that the writ of habeas corpus issue ninety days after the filing of this Opinion and Order, and that petitioner be released from custody, unless within such ninety day period State officials initiate action for a new trial of petitioner. If State officials initiate action for a new trial, it is ordered that no writ of habeas corpus shall issue.